[This opinion has been published in *Ohio Official Reports* at 72 Ohio St.3d 354.]

THE STATE OF OHIO, APPELLEE, *v*. BERRY, APPELLANT.

[Cite as *State v. Berry*, 1995-Ohio-310.]

*Criminal law—Aggravated murder—Death penalty upheld, when—"Mental illness" does not necessarily equate with definition of "legal incompetency."*

The term "mental illness" does not necessarily equate with the definition of legal incompetency.

(No. 93-2592—Submitted April 18, 1995—Decided June 28, 1995.)

APPEAL from the Court of Appeals for Cuyahoga County, No. 60531.

_____

{¶ 1} Charles J. Mitroff, Jr. owned and operated Charles Bakery in Cleveland, Ohio. On November 28, 1989, Mitroff hired Wilford Berry (a.k.a. "Edward Thompson"), appellant, to wash dishes and floors at the bakery. On November 30, 1989, at approximately 11:45 p.m., Mitroff arrived at the bakery and then left to begin making deliveries to his customers. While Mitroff was gone, appellant and Anthony Lozar brought two weapons into the bakery and awaited Mitroff's return.

{¶ 2} When Mitroff returned to the bakery, Lozar shot him once in the torso with an SKS Chinese Model 56 semi-automatic assault rifle. Appellant then shot Mitroff in the head with a sawed-off .22 caliber rifle. Appellant and Lozar placed Mitroff's body in the delivery van, removed Mitroff's wallet, and buried the body near a bridge at E. 49th Street and Chard Avenue in Cleveland. After burying the body, the men switched one of the license plates on the van with a license plate registered to a 1984 Ford station wagon. They then washed the van at a car wash and painted the van with black spray-paint.

{¶ 3} On December 3, 1989, appellant visited his sister, Elaine L. Quigley. Quigley informed appellant that police wanted to question appellant regarding

Mitroff's disappearance. Shortly thereafter, appellant and Lozar fled to Kentucky in Mitroff's van.

{¶ 4} In the early morning hours of December 4, 1989, Patrolman Charles S. Vorhees of the Kenton County (Kentucky) Police Department observed a van being driven erratically. Vorhees suspected that the driver might be intoxicated. He observed the van weaving back and forth and slowing at intersections. He also noticed that the Ohio license plate on the van did not appear to belong on that vehicle. Vorhees radioed for information concerning the license plate number and was informed that the plate had been registered to a Ford station wagon. When Vorhees stopped the van, he observed the two occupants, appellant and Lozar, leaning over as if to place something under the front seats.

{¶ 5} Vorhees approached the van and noticed that it had been spray-painted flat black. Vorhees asked appellant for his driver's license, but appellant was unable to produce a license. Appellant told Vorhees that his name was "Edward Thompson," and provided Vorhees with a birth date, middle name, and Social Security Number. With this information, Vorhees ran a computer check to determine whether the driver had been issued an Ohio driver's license. The computer check revealed that no person by the name of Edward Thompson had been issued a driver's license in Ohio. The passenger in the vehicle identified himself as Anthony Lozar.

{¶ 6} Vorhees ordered both men out of the vehicle. As Lozar opened the front passenger's door, Vorhees saw the butt-end of a cut-off rifle stock sticking out from under the front passenger's seat. Vorhees drew his weapon and ordered both men to lie on the ground. He handcuffed the men and secured the .22 caliber rifle from the van. While securing the weapon, Vorhees noticed a rifle case positioned behind the front seats. Vorhees grabbed the rifle case and the weapon contained therein—an SKS Chinese Model 56 semi-automatic assault rifle. Vorhees also saw and secured a bag that appeared to contain marijuana. Further, Vorhees noticed a

reddish substance on the floor of the vehicle that appeared to be blood. Forensic testing later revealed that the bloodstains in the van matched the blood of the victim.

{¶ 7} Vorhees arrested appellant for traffic, weapon, and drug offenses. Vorhees transported appellant and Lozar to the police station, where appellant eventually identified himself as Wilford Berry. A computer check of the van's vehicle identification number revealed that the vehicle was registered to Charles Bakery in Cleveland. Then, Vorhees sent a teletype to Cleveland authorities concerning the discovery of the van. Vorhees was later informed by the Pepper Pike (Ohio) Police Department that the van and the owner of the van had been reported missing. Later that day, on December 4, 1989, Lozar confessed to police detectives and told them the location of Mitroff's body. That information led to the discovery of the body near E. 49th Street and Chard Avenue in Cleveland.

{¶ 8} On December 13, 1989, Mark Carter, a Kenton County deputy jailer, escorted appellant to a court appearance before a Kentucky court. According to Carter, appellant appeared uncomfortable and began mumbling. Carter asked appellant what was wrong. Appellant replied that he (appellant) and another man had entered a bakery and shot someone in the stomach and forehead. Appellant told Carter about frisking the victim, obtaining the victim's keys to the van, loading the body into the van, and burying the body in a shallow grave. Appellant claimed that he and his accomplice had cleaned the van at a car wash to remove the blood from the vehicle. At that point, Carter asked whether appellant had killed the man. Appellant replied, "Yes, I did."

{¶ 9} While appellant was attending the court appearance, inmates in appellant's jail cell began complaining that he had been bragging about a murder. After appellant returned from court, jailer Michael Moran moved appellant to a new cell. There, appellant approached Moran and stated that he (appellant) and appellant's partner were responsible for the murder in Cleveland. Appellant claimed that his shoes were still covered with the victim's blood. Moran asked for

and obtained appellant's shoes. Bloodstains on the shoes were later found to match the victim's blood type. Moran called the prosecuting attorney's office to report appellant's admissions. The prosecutor's office contacted Detective Matthew Rolfsen of the Kenton County Police Department.

{¶ 10} Detective Rolfsen interviewed appellant on December 13, 1989. Appellant chose to speak with Rolfsen after having been advised of his (appellant's) *Miranda*[1] rights. Appellant provided Rolfsen with the following detailed account of the murder.

{¶ 11} Appellant began planning Mitroff's murder approximately ten hours before the killing. He obtained the .22 caliber rifle and Chinese assault rifle and hid the weapons in an alley near Charles Bakery. After Mitroff left the bakery to make deliveries, appellant and/or Lozar retrieved the weapons. Appellant handed Lozar the assault weapon and instructed him to hide in the bakery. Appellant placed the .22 caliber rifle under a counter in the bakery. When Mitroff returned to the store, Lozar shot Mitroff in the torso with the assault rifle. Mitroff fell to the floor, looked at appellant and said, "You shot me." Appellant laughed and said, "I didn't shoot you. Do I have a gun?" Appellant knew that Mitroff was dying, and that one more shot would kill him. Mitroff begged appellant to call for help. At that point, appellant took the .22 caliber rifle from beneath the counter, walked over to Mitroff, and fired a single shot into Mitroff's head. Appellant and Lozar loaded Mitroff's body into the delivery van and attempted to thoroughly clean the murder scene. They mopped the floors, broke the mop in half, and placed the broken mop in the garbage. Appellant knew that the garbage would be emptied that morning. Appellant and Lozar then drove the van to Lozar's sister's home to obtain a shovel. Later, they removed the victim's wallet and buried the body in a shallow grave. The men then proceeded to a car wash, where they washed the van and accidentally left

---

1. *Miranda v. Arizona* (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694.

the shovel, a bloody piece of fiberboard and other items. Thereafter, appellant and Lozar purchased black spray-paint and painted the vehicle before heading to Kentucky.

{¶ 12} Cleveland police recovered the shovel, the bloodstained piece of fiberboard and other items from the American Pride Car Wash in Cleveland. The dirt on the shovel matched dirt samples taken from the location where Mitroff's body had been discovered. Lozar's brother-in-law confirmed that the shovel found at the car wash belonged to him. Bloodstains on the shovel tested positive for human blood. Additionally, blood samples taken from the piece of fiberboard were consistent with samples of the victim's blood.

{¶ 13} In December 1989, the Cuyahoga County Grand Jury indicted appellant on two separate counts for the aggravated murder of Mitroff. Count One charged appellant with purposefully, and with prior calculation and design, causing Mitroff's death. Count Two charged appellant with the purposeful killing of Mitroff during the commission of an aggravated robbery and/or aggravated burglary. Each of the two counts of aggravated murder carried two death penalty specifications: one alleging that the offense was committed during the course of an aggravated burglary (R.C. 2929.04[A][7]), and the other alleging that the offense was committed during the course of an aggravated robbery (R.C. 2929.04[A][7]). Appellant was also indicted on one count of aggravated robbery and one count of aggravated burglary. Additionally, each count in the indictment carried a firearm specification.[2]

{¶ 14} Appellant was tried before a jury. The jury found appellant guilty of all charges and specifications alleged in the indictment. Following a mitigation hearing, the jury recommended that appellant be sentenced to death for each of the

2. Lozar and appellant were charged in the same indictment. However, the two men were tried separately. Lozar was ultimately convicted for the aggravated murder of Mitroff and was sentenced to a term of life imprisonment.

two counts of aggravated murder. The trial court accepted the jury's recommendation and imposed a single death sentence. For the remaining offenses, appellant was sentenced in accordance with law. On appeal, the court of appeals affirmed appellant's convictions and sentences, including the sentence of death.

{¶ 15} The cause is now before this court upon an appeal as of right.

_____

*Stephanie Tubbs Jones*, Cuyahoga County Prosecuting Attorney, and *Karen L. Johnson*, Assistant Prosecuting Attorney, for appellee.

*David H. Bodiker*, Ohio Public Defender, *Randy D. Ashburn* and *Cynthia A. Yost*, Assistant Public Defenders, for appellant.

_____

**DOUGLAS, J.**

{¶ 16} Appellant presents a number of issues for our consideration. (See Appendix, *infra*.) We have carefully considered each of appellant's propositions of law, independently weighed the aggravating circumstances against the evidence presented in mitigation, and reviewed the death penalty for appropriateness and proportionality. For the reasons that follow, we affirm the judgment of the court of appeals and uphold appellant's death sentence.

I

{¶ 17} R.C. 2929.05 requires this court to review capital cases in a certain manner. However, as we have held on a number of previous occasions, R.C. 2929.05 does not require this court to address and discuss, in opinion form, each and every proposition of law raised by the parties. See, *e.g.*, *State v. Poindexter* (1988), 36 Ohio St.3d 1, 3, 520 N.E.2d 568, 570; *State v. Bonnell* (1991), 61 Ohio St.3d 179, 181, 573 N.E.2d 1082, 1085; *State v. Hawkins* (1993), 66 Ohio St.3d 339, 342, 612 N.E.2d 1227, 1230; and *State v. Scudder* (1994), 71 Ohio St.3d 263, 267, 643 N.E.2d 524, 528. We adhere to that position today. Upon a careful review of the record and the governing law, we fail to detect any errors that would

undermine our confidence in the integrity and reliability of the trial court's findings. We address, in opinion form, only those issues that warrant some discussion.

## II

{¶ 18} Appellant was examined before trial by the defense's court-appointed clinical psychologist, Dr. Robert W. Goldberg. From Goldberg's examination of appellant, Goldberg determined that appellant was sane at the time of the killing and was competent to stand trial. Accordingly, prior to trial, defense counsel never raised the issue of appellant's competency or the defense of not guilty by reason of insanity.

{¶ 19} The mitigation phase of appellant's trial commenced on July 30, 1990. That morning, defense counsel moved for a new trial on the basis of newly discovered evidence to pursue a defense of not guilty by reason of insanity. In doing so, defense counsel raised, for the first time, the issue of appellant's competency to stand trial. Specifically, the defense claimed that it had recently acquired information indicating that Mitroff had nearly hit appellant's sister and niece with a delivery van sometime prior to appellant's employment at the bakery. That information had come from appellant's sister, Elaine Quigley. Counsel told the court that appellant had previously withheld this information from the defense and that appellant was now claiming that the incident motivated him to kill Mitroff. According to defense counsel, appellant had previously maintained that he killed Mitroff for "no reason." Defense counsel claimed that appellant's act of withholding information as to a possible motive raised a question regarding appellant's sanity. Additionally, defense counsel indicated that the newly discovered evidence had led Dr. Goldberg to suggest that appellant might not be sane enough to proceed with the mitigation phase. The trial court denied appellant's motion for a new trial and did not order a competency hearing. The case then proceeded to conclusion without appellant having ever been adjudicated competent to stand trial.

{¶ 20} In his third proposition of law, appellant contends that the trial court erred by proceeding to the mitigation phase without conducting a mid-trial hearing on the issue of his competence. Appellant suggests that such a hearing was constitutionally required and/or statutorily mandated. We disagree.

{¶ 21} Fundamental principles of due process require that a criminal defendant who is legally incompetent shall not be subjected to trial. See *Pate v. Robinson* (1966), 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815; and *Drope v. Missouri* (1975), 420 U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103. In *Pate*, *supra*, the United States Supreme Court held that the failure to observe procedures adequate to protect a defendant's right not to be tried or convicted while incompetent to stand trial deprives the defendant of the right to a fair trial. In *Dusky v. United States* (1960), 362 U.S. 402, 80 S.Ct. 788, 789, 4 L.Ed.2d 824, 825, the United States Supreme Court set forth the test to determine whether a defendant is competent to stand trial, stating that "* * * the 'test must be whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him.'" See, also, *Drope*, *supra*, 420 U.S. at 172, 95 S.Ct. at 904, 43 L.Ed.2d at 113. The right to a hearing on the issue of competency rises to the level of a constitutional guarantee where the record contains "sufficient indicia of incompetency," such that an inquiry into the defendant's competency is necessary to ensure the defendant's right to a fair trial. See *Drope*, *supra*, 420 U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103; *Pate*, *supra*, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815; and *State v. Bock* (1986), 28 Ohio St.3d 108, 110, 28 OBR 207, 209, 502 N.E.2d 1016, 1018-1019.

{¶ 22} In Ohio, R.C. 2945.37 protects the right of a criminal defendant not to be tried or convicted while incompetent. R.C. 2945.37(A) provides, in part:

"In a criminal action in a court of common pleas or municipal court, the court, prosecutor, or defense may raise the issue of the defendant's competence to

stand trial. If the issue is raised before trial, the court shall hold a hearing on the issue as provided in this section. *If the issue is raised after trial has begun, the court shall hold a hearing on the issue only for good cause shown.*

"A defendant is presumed competent to stand trial, unless it is proved by a preponderance of the evidence in a hearing under this section that because of his present mental condition he is incapable of understanding the nature and objective of the proceedings against him or of presently assisting in his defense." (Emphasis added.)

{¶ 23} R.C. 2945.37(A) requires a trial court to hold *a mid-trial hearing* on the issue of competency "only for good cause shown." The statutory requirement mandating a showing of "good cause" has been construed in accordance with the general principles set forth in *Drope* and *Pate*, *supra*. See *State v. Chapin* (1981), 67 Ohio St.2d 437, 21 O.O.3d 273, 424 N.E.2d 317. Pursuant to R.C. 2945.37(A), the issue of competency may be raised by the prosecution, the defense, or on the court's own motion. The determination whether to conduct a mid-trial competency hearing is normally a matter committed to the sound discretion of the trial court. See *State v. Rahman* (1986), 23 Ohio St.3d 146, 156, 23 OBR 315, 323, 492 N.E.2d 401, 410.

{¶ 24} Here, the issue of competency was raised mid-trial, *i.e.*, after the guilt phase, but immediately before the commencement of the mitigation phase. Thus, R.C. 2945.37(A) mandated a hearing on the issue only for "good cause shown."[3] However, upon a review of the record, we find no "sufficient indicia of incompetency" or "good cause shown" that would have entitled appellant to a

---

3. In this proposition, appellant suggests R.C. 2945.37(A) required that a competency hearing be held without a showing of good cause since the issue of appellant's competency was raised "before trial," *i.e.*, before what appellant calls the "penalty trial." However, appellant fails to grasp that his trial was actually composed of two distinct *phases*—the guilt *phase* and the mitigation/penalty *phase*. Appellant raised the issue of competency before the commencement of the second phase of his trial. The issue was not raised "before trial" within the meaning of R.C. 2945.37(A).

competency hearing at the time the issue was raised. Therefore, the trial court did not abuse its discretion in proceeding with the mitigation phase without conducting a hearing as to appellant's competency to stand trial.

{¶ 25} At the time the issue of appellant's competency was raised, the trial court was made aware of defense counsel's representations that (1) appellant may have intentionally withheld information regarding a possible motive for the killing, (2) appellant wanted to die and intended to inform the jury of his wishes, (3) appellant had not cooperated in his defense, and (4) appellant's court-appointed psychologist had recently developed "some strong feelings" that there was a possibility that appellant was not sane enough to be executed or to proceed with the mitigation hearing. Additionally, defense counsel informed the court of his belief that appellant was "sick" because appellant had withheld information regarding an alleged motive for the killing. However, we find that none of these matters, taken singularly or together, constitutes sufficient indicia of incompetency raising any doubt as to appellant's competency to stand trial.

{¶ 26} The information concerning a possible motive for the slaying was inherently suspect. As the trial court stated to defense counsel, "* * * I think you can't discount the fact all of these things you are telling me are your client's self-serving statements or the self-serving statements of his family." Similarly, the court of appeals stated that "[t]he information withheld reasonably could be viewed as a last-minute attempt by the defendant to somehow justify his actions." We agree with this assessment of the issue. However, we do not completely dismiss this evidence as having no bearing on the issue whether the record, as a whole, warranted a mid-trial competency hearing.

{¶ 27} As to appellant's expressed preference for the death penalty, such a sentence could be deemed preferential to life imprisonment for this appellant. A professed wish for the death penalty (as opposed to a lifelong term of imprisonment) does not, by itself, call the defendant's competence into question.

Similarly, appellant's failure to cooperate with counsel does not indicate that appellant was incapable of assisting in his defense. Indeed, a review of the record demonstrates that appellant understood the nature and objective of the proceedings against him and, in fact, offered a lengthy and coherent unsworn statement during the mitigation phase.

{¶ 28} With respect to defense counsel's representations that appellant's court-appointed psychologist had some "strong feelings" that appellant was possibly not competent to proceed in the mitigation phase, we note that when defense counsel raised this issue he specifically acknowledged that appellant understood the role of the court and jury. Additionally, the psychologist's beliefs were based on the possibility that, due to appellant's psychological condition, appellant may have singled Mitroff out as the victim because Mitroff had almost accidentally hit appellant's sister and niece with a delivery van. The psychologist's hypothesis was based upon a series of assumptions and was only as good as the information initially supplied to him by appellant and appellant's family. Moreover, we note that appellant was twice examined by the court-appointed psychologist prior to trial. Although the reports of the examinations are not contained in the record, the record does indicate that the psychologist found appellant to be sane at the time of the murder and competent to stand trial.

{¶ 29} Moreover, we find that defense counsel's statement that appellant was "sick" for withholding information concerning a possible motive for the killing was not particularly persuasive evidence indicating that appellant was incompetent to stand trial.

{¶ 30} In addition to these various factors, appellant points out that during a pretrial hearing the court threatened to remove appellant from the courtroom for disrupting the proceedings. However, a review of the record reveals that this incident was relatively minor and was the only one of its kind during the entire course of the proceedings. Appellant also points to his willingness to speak with

police as evidence indicating incompetence and/or insanity, but we are not persuaded that this in any way reflected poorly on appellant's competence to stand trial. Additionally, appellant notes that even the prosecuting attorney admitted during argument on the motion for a new trial that appellant had some "mental illness." Nevertheless, the term "mental illness" does not necessarily equate with the definition of legal incompetency. Legal incompetency has a specific meaning as we have set forth above.

{¶ 31} Appellant also relies upon the evidence presented during the mitigation phase as proof that he was legally incompetent. However, these matters were obviously not before the trial judge at the time the issue of competency arose. Further, the mitigating evidence was offered for the sole purpose of mitigation and did not in any way indicate that appellant was incapable of understanding the nature and objective of the proceedings or of assisting in his defense.

{¶ 32} Reviewing the record as a whole, and carefully considering the totality of the evidence bearing on the question, we are convinced that the trial court did not abuse its discretion in failing to order a mid-trial competency hearing. Moreover, in our judgment, the record indicates that at all times appellant knew the nature and objective of the proceedings against him and was perfectly capable of participating in his defense if and when he chose to do so. Accordingly, we reject appellant's third proposition of law.[4]

III

{¶ 33} In his fourth proposition of law, appellant contends that he did not receive the effective assistance of counsel "due to trial counsel's deficient and

---

4. In this proposition, appellant also contends that the trial court erred by finding that the motion raised by appellant prior to the commencement of the penalty phase was "untimely." Appellant correctly observes that pursuant to R.C. 2945.37(A), the issue of competency can be raised during trial. However, the trial court's comment concerning the timeliness of appellant's motion most likely dealt with appellant's request for a new trial in order to present a defense of not guilty by reason of insanity.

prejudicial representation for failing to bring Mr. Berry's lack of competency to the trial court's attention at the suppression hearing and prior to the beginning of the trial phase." However, we find that appellant has failed to meet his burden of establishing ineffective assistance of counsel under the standards set forth in *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674. Furthermore, a number of appellant's assertions in this proposition are wholly unsupported by law or fact. For instance appellant suggests that his admissions to jailers Carter and Moran and his confession to Detective Rolfsen were unconstitutionally obtained and resulted from improper coercion and overreaching. The evidence simply does not support appellant's contentions in this regard. Additionally, a number of the issues and arguments raised in this proposition of law are repetitive of the matters we addressed in our discussion in Part II, *supra*.

{¶ 34} Accordingly, appellant's fourth proposition of law is not persuasive.

IV

{¶ 35} Having considered appellant's propositions of law, we must now review appellant's death sentence for appropriateness (also raised in appellant's first proposition of law) and proportionality (also raised in appellant's second proposition of law). Appellant planned Mitroff's death and shot Mitroff in the head during the commission of an aggravated robbery and an aggravated burglary. Again, we find that the aggravating circumstances for which appellant was found guilty, both of which are set forth in R.C. 2929.04(A)(7), were proven beyond a reasonable doubt.

{¶ 36} In mitigation, appellant presented the testimony of a variety of witnesses. Ginny Renee Franklin, appellant's mother, testified that appellant was born in September 1962. According to Franklin, appellant's father left her and was committed to a mental hospital when appellant was an infant. During appellant's childhood, appellant suffered from a speech impediment and had trouble with his eyes. Franklin testified that appellant had a number of physical ailments as a child,

including seizures and lung problems. Franklin stated that she had read books concerning the occult and had once participated in a seance. She claimed that appellant sometimes spoke of "the lady in black," and that appellant thought that this imaginary character was trying to kill him. Franklin stated that appellant, at age seven, was involved in fights with other children. On one occasion, a neighborhood boy paid other children to physically beat appellant. Franklin testified that appellant ran away from home on two occasions when he was approximately fourteen years of age. He was eventually sent to the Boys' Village, a residential treatment center for boys with severe behavior and emotional problems. Franklin told of an incident in appellant's childhood in which appellant came home one evening wearing no clothes. She also indicated that appellant may have been the victim of sexual advances by a man in the Big Brothers program. Franklin testified that appellant had once been arrested in Texas for car theft, and that he had attempted to commit suicide while serving a sentence for that offense. Franklin also testified that sometime prior to the murder, appellant or possibly someone else had burned several marks in her kitchen floor. According to Franklin, the pattern of the marks was consistent with a symbol used in witchcraft or devil worship.

{¶ 37} Elaine Quigley, appellant's sister, testified that her father spent time in a number of mental institutions. She stated that her father died in 1979 of an aneurysm. She testified that, according to her father's family, her father had been diagnosed at sixteen years of age with a condition causing the deterioration of the brain. Quigley also testified that appellant's speech impediment as a child was so severe that no one other than Quigley could really understand him. Quigley testified that appellant, as a child, had told her about the "lady in black," and that appellant claimed to have heard voices in his head. Quigley testified further that Mitroff had almost accidentally hit her with the bakery van prior to appellant's

14

employment at the bakery. According to Quigley, she told appellant of this incident when appellant accepted the job at the bakery.

{¶ 38} Appellant also presented the testimony of Ralph Buterbaugh, a psychologist who evaluated appellant at Boys' Village in 1978 and 1979. Appellant was fifteen years old at the time of the 1978 evaluation. The results of the 1978 evaluation indicate that appellant was a very troubled youth. In that evaluation, Buterbaugh said that appellant was "seriously unstable and maladjusted." Buterbaugh testified in mitigation that he had noted in the report that appellant had "schizoid symptoms" and a very high hostility level. The 1978 report indicates that appellant thought that he was a condemned person with evil spirits commanding him at times. The 1978 report concludes by stating, among other things, that "[t]he severity of Will's present emotional condition and his marked lack of coping skills * * * dictate a prolonged treatment period. * * * His high hostility level and strong acting-out potential is an additional danger signal that corroborates Will's mother's fear that he might someday kill someone." However, Buterbaugh's 1979 evaluation of appellant demonstrates that appellant had improved "quite markedly" by that time.

{¶ 39} Stephen Malich, a counselor at Boys' Village, also testified in mitigation. Malich had prepared a diagnostic profile of appellant in 1978, and concluded, at that time, that appellant had a poor self-image, resented authority figures, and perceived the world and his environment as threatening.

{¶ 40} Additionally, appellant presented the testimony of Dr. Goldberg, appellant's court-appointed psychologist. Goldberg had examined appellant several months before trial and found him to be suffering from "considerable emotional disturbance." As a result of the initial tests performed on appellant, Goldberg had concluded, at that time, that appellant could be considered "technically chronically borderline schizoid or maybe even schizophrenic." Goldberg next tested appellant on June 21, 1990, just a few days before trial, and observed more symptoms of

psychosis which were attributable to stress. Goldberg testified that appellant claimed to have been sexually molested by baby-sitters in his youth. According to Goldberg, appellant heard voices (auditory hallucinations) and believed in the supernatural. Goldberg diagnosed appellant as suffering from a "psychotic disorder not otherwise specified, a typical psychosis." Goldberg also diagnosed appellant as suffering from "a personality disorder mixed with what are called schizotypal, borderline, and anti-social features." Goldberg explained to the jury that because appellant's father was mentally ill, there was "probably a genetic component" to appellant's psychological problems.

{¶ 41} According to Goldberg, Quigley told him about the incident in which Mitroff had accidentally almost hit her with the delivery van. Goldberg testified that when he questioned appellant about the incident, appellant claimed that the incident "singled Mr. Mitroff out" as the victim. Goldberg theorized that "this killing, in part, was because, I think, he perceived Mr. Mitroff, rightly or not, I mean his perception of it was—I don't know what the man's real characteristics were, but he perceived Mr. Mitroff as another authority figure, another parent-type that just doesn't care about people, whether that was true or not." Goldberg testified that the incident provided appellant with "a possible motive" for the killing.

{¶ 42} Finally, appellant gave an unsworn statement in which he related certain events of his childhood. These events included alleged molestations by baby-sitters, beatings inflicted upon him by his mother, beatings suffered at the hands of other children, and his various childhood health problems. Appellant claimed that he had been raped while serving a six-year prison term in Texas. Appellant stated that he was in California during an earthquake. Appellant told of his volunteer efforts to help victims of the quake. Appellant stated that he had a mental problem and that he would not receive appropriate care in jail. He requested that the jury recommend the death penalty rather than a sentence of twenty or thirty years to life.

**{¶ 43}** Upon review of the evidence presented in mitigation, it is clear to us that appellant had a troubled and difficult childhood. We find that appellant's troubled childhood, his history of psychological problems, and his general history and background are entitled to some weight in mitigation.

**{¶ 44}** The nature and circumstances of the offense do not reveal any matter of mitigating value. Further, we find that appellant did not establish the existence of the R.C. 2929.04(B)(1) and (2) mitigating factors by a preponderance of the evidence. Specifically, Mitroff did not in any way induce or facilitate the murder (R.C. 2929.04[B][1]), and there exists no credible evidence indicating that appellant was acting under duress, coercion, or strong provocation (R.C. 2929.04[B][2]).

**{¶ 45}** Appellant introduced evidence on the R.C. 2929.04(B)(3) mitigating factor that he lacked a substantial capacity to conform his conduct to the requirements of the law because of a mental disease or defect. We find that appellant did not demonstrate the existence of this mitigating factor by a preponderance of the evidence. Goldberg diagnosed appellant as suffering from psychosis. Goldberg testified that the incident in which Mitroff allegedly almost had hit appellant's sister with the delivery van was a *possible* motive for the killing, given appellant's psychological condition. However, in our judgment, no credible evidence was presented by appellant to establish that the murder was, in fact, the product of appellant's psychological condition. Nevertheless, we find that appellant's psychosis and personality disorder testified to by Goldberg is entitled to some weight in mitigation.

**{¶ 46}** We have considered the youth of the offender (appellant was twenty-seven years old at the time of the offense) and conclude that this R.C. 2929.04(B)(4) factor is entitled to no weight in mitigation.

**{¶ 47}** Appellant has a prior theft conviction and a juvenile record. However, we find that the R.C. 2929.04(B)(5) mitigating factor that appellant

17

lacked a *significant* history of prior criminal convictions and delinquency adjudications is entitled to some, but very little, weight in mitigation.

{¶ 48} The R.C. 2929.04(B)(6) mitigating factor is not applicable here, since appellant was the principal offender. Moreover, the evidence is overwhelming that appellant planned the murder, orchestrated the killing, fired the fatal shot into the victim's head, actively concealed the evidence of the murder, and then fled to escape apprehension for the killing.

{¶ 49} We have considered the evidence that appellant does well in a controlled institutionalized setting, but we find that this evidence is rebutted by other evidence in the record. However, we do find that the evidence of appellant's volunteer services for victims of the California earthquake is entitled to some, but very minimal, weight in mitigation. We reject appellant's contentions that there exists some "residual doubt" whether he was the principal offender; that his wish to be executed should be given some weight in mitigation; and that we should consider, as mitigation, that Lozar was given a life sentence.

{¶ 50} Weighing the aggravated circumstances against the evidence presented in mitigation, we find that the aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt.

{¶ 51} As a final matter, we have undertaken a comparison of the sentence imposed in this case to those in which we have previously imposed the death penalty. We find that appellant's death sentence is neither excessive nor disproportionate. See, *e.g.*, *State v. Holloway* (1988), 38 Ohio St.3d 239, 527 N.E.2d 831; *State v. Slagle* (1992), 65 Ohio St.3d 597, 605 N.E.2d 916; *State v. Clark* (1988), 38 Ohio St.3d 252, 527 N.E.2d 844; and *State v. Bonnell* (1991), 61 Ohio St.3d. 179, 573 N.E.2d 1082.

{¶ 52} Accordingly, we affirm the judgment of the court of appeals.

*Judgment affirmed.*

MOYER, C.J., RESNICK, F.E. SWEENEY, PFEIFER and COOK, JJ., concur.

WRIGHT, J., dissents.

_____

**WRIGHT, J., dissenting.**

{¶ 53} Some years ago I expressed the view that an individual with an intelligence quotient of a ten year old should not be subject to the death penalty. *State v. Rogers* (1985), 17 Ohio St.3d 174, 188, 17 OBR 414, 427, 478 N.E.2d 984, 997 (Wright, J., concurring in part and dissenting in part), vacated (1985), 474 U.S. 1002, 106 S.Ct. 518, 88 L.Ed.2d 452. Similarly, I cannot sanction the penalty of death for a person who appears to be mentally ill.

{¶ 54} Dr. Goldberg, a court-appointed clinical psychologist, opined that appellant was a chronically borderline schizoid and potentially schizophrenic.[5] This diagnosis, which appears to be undisputed, goes far beyond an opinion that would suggest emotional illness or a mere mental defect. The majority even acknowledges the seriousness of appellant's mental illness: "[The] appellant's psychosis and personality disorder testified to by Goldberg is entitled to some weight in mitigation." However, the majority goes on to reach what I believe is an untenable result of affirming appellant's death penalty.

{¶ 55} The majority's decision to affirm appellant's death penalty is untenable in light of the fact that the Supreme Court of the United States has clearly held that execution of one who is insane violates the Eighth Amendment to the United States Constitution: "[T]he natural abhorrence civilized societies feel at killing one who has no capacity to come to grips with his own conscience or deity is still vivid today. And the intuition that such an execution simply offends humanity is evidently shared across this Nation. Faced with such widespread evidence of a restriction upon sovereign power, this Court is compelled to conclude

_____

5. Dr. Goldberg concluded his lengthy testimony by offering the following opinion during the mitigation phase of appellant's trial: "He's a man that has had a traumatic and disturbed childhood. He has physical problems, emotional problems. He has a diagnosable mental illness [schizophrenia], as well as physical and emotional problems ***."

that the Eighth Amendment prohibits a State from carrying out a sentence of death upon a prisoner who is insane." *Ford v. Wainwright* (1986),  477 U.S. 399, 409-410, 106 S.Ct. 2595, 2602, 91 L.E.2d 335, 346.

{¶ 56} It is my view that appellant currently belongs in an institution for the criminally insane.  Accordingly, I respectfully dissent in this case.

_____

APPENDIX

{¶ 57} "Proposition of Law No. 1[:]   Pursuant to this court's de novo independent review under Ohio Revised Code Section 2929.05, death is not the appropriate sentence for Wilford Lee Berry, Jr.

{¶ 58} "Proposition of Law No. 2[:]  Pursuant to this court's proportionality review under Ohio Revised Cod[e] Section 2929.05, the death penalty is excessive and disproportionate in Wilford Lee Berry Jr.'s case.

{¶ 59} "Proposition of Law No. 3[:]  When a capital defendant requests a competency hearing for the first time prior to commencement of his penalty trial, and where the trial court is aware of circumstances creating a 'bonafide doubt' as to the defendant's competency, then the trial court cannot, consistent with the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution and Sections 2, 9, 10, and 16, Article I of the Ohio Constitution, refuse to hold a competency hearing on the sole basis that the request was 'untimely.'

{¶ 60} "Proposition of Law No. 4[:]  A person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to trial.  Drope v. Missouri * * * [(1975), 420 U.S. 162, 95 S.Ct. 896 , 43 L.Ed.2d 103].

{¶ 61} "Proposition of Law No. 5[:]  The failure to grant a new trial motion based upon newly discovered evidence in support of a not guilty by reason of insanity plea deprives a capital defendant of substantive and procedural due process

guaranteed by the Eighth, Ninth, and Fourteenth Amendments to the United States Constitution.

{¶ 62} "Proposition of Law No. 6[:]  A defendant's rights guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendment[s] to the United States Constitution and Article I, Sections 2, 9, 10 and 16 of the Ohio Constitution are violated when incriminating statements and evidence are obtained in violation of rights under Miranda v. Arizona [(1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694].

{¶ 63} "Proposition of Law No. 7[:]  When a burglary is based upon the commission of an 'other felony' instead of a theft offense (i.e., murder), it is unconstitutional to use that same burglary to:  1) convert a murder into a capital offense, or 2) as an aggravating circumstance upon which to base a death penalty.

{¶ 64} "Proposition of Law No. 8[:]  A warrantless arrestee may only be held for a maximum of forty-eight hours before he is brought before a magistrate for an initial probable cause hearing.  Any statement made during an illegal detention or evidence discovered as a result of those statements must be suppressed under the Fourth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution, and Sections 2, 9, 10, 16 and 20, Article I of the Ohio Constitution.

{¶ 65} "Proposition of Law No. 9[:]  An indictment which charges a capital defendant with aggravated felony-murder based on accusations that the defendant committed 'robbery and/or burglary', violates the prohibition against duplicitous indictments and deprives the capital defendant of his rights to a unanimous verdict * * *[,] as well as substantive and procedural due process as guaranteed by the Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution, Article I, Sections 1, 2, 9, 10, 16 and 20 of the Ohio Constitution.

{¶ 66} "Proposition of Law No. 10[:]  It is a violation of substantive and procedural due process as guaranteed by the Eighth, Ninth, and Fourteenth Amendments to the United States Constitution, as well as Article I, Sections 1, 2,

9, 10, 16 and 20 of the Ohio Constitution, to force a capital defendant to proceed with his appeal to this court when he does not know upon what conviction his death penalty rests.

{¶ 67} "Proposition of Law No. 11[:]  The failure to instruct, consider and give effect to relevant mitigation evidence undermines the reliability that death is the appropriate punishment in violation of the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution and Article I, Sections 2, 5, 9J [sic, 9], 10, 16 and 20 of the Ohio Constitution.

{¶ 68} "Proposition of Law No. 12[:]  A court of appeals does not fulfill its Ohio Revised Code Section 2929.05 duties to provide capital defendants with independent de novo review when it provides no explanation as to why it found the aggravating circumstances to outweigh the mitigating factors.

{¶ 69} "Proposition of Law No. 13[:]   A capital defendant cannot be convicted of two counts of aggravated murder for a single homicide without a violation of the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution and Sections 2, 5, 9, 10, and 16, Article I of the Ohio Constitution, and R.C. 2941.25.

{¶ 70} "Proposition of Law No. 14[:]   Where duplicative aggravating circumstances are considered by a capital sentencer, the reliability of the sentencing process is destroyed and results in an arbitrary and capricious imposition of the death sentence in violation of the Fifth, Eighth and Fourteenth Amendments to the United States Constitution and Article I, Sections 9, 10 and 16, of the Ohio Constitution.

{¶ 71} "Proposition of Law No. 15[:]  When the independent elements of principal offender and prior calculation and design in Revised Code 2929.04(A)(7) are charged and there is no separate finding as to which separate element was proven beyond a reasonable doubt, it violates a capital defendant's right guaranteed

22

by the Fifth, Sixth, Eighth, and Fourteenth Amendment[s] to the United States Constitution and Article I, Sections 2, 5, 9, 10 and 16 of the Ohio Constitution.

{¶ 72} "Proposition of Law No. 16[:] When in a capital trial, jury instructions in both phases are erroneous, misleading and/or confusing, fail to require the sentencer to find all elements of the crime charged and fail to provide adequate guidance for considering and giving effect to relevant mitigating evidence, the defendant is deprived of his rights as guaranteed by the Fifth, Sixth, Eighth, Ninth and fourteenth Amendments to the United States Constitution and Article I, Sections 2, 5, 9, 10, 16, and 20 of the Ohio Constitution.

{¶ 73} "Proposition of Law No. 17[:] Ohio's definition of reasonable doubt reflects a 'clear and convincing' evidence standard, which is lower than the degree of proof required by the United States Constitution.

{¶ 74} "Proposition of Law No. 18[:] When a defendant is arrested without probable cause, and an illegal warrantless search occurs it is in violation of that defendant's rights as guaranteed by the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendment[s] to the United States Constitution and Article I, Sections 2, 9, 10, 14 and 16 of the Ohio Constitution.

{¶ 75} "Proposition of Law No. 19[:] When evidence is destroyed, it violates that defendant's rights as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Article I, Section[s] 2, 9, 10, and 16 of the Ohio Constitution.

{¶ 76} "Proposition of Law No. 20[:] Capital proceedings cannot be held in the absence of the defendant without violating rights guaranteed by the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution and Sections 2, 9, 10, and 16, Article I of the Ohio Constitution.

{¶ 77} "Proposition of Law No. 21[:] A capital defendant is denied his Sixth, Eight [sic, Eighth] and Fourteenth Amendment rights to a fair trial, due process and a reliable determination of his guilt and sentence when gruesome,

prejudicial and cumulative photographs are admitted into evidence even though their prejudicial effect outweighs their probative value.

{¶ 78} "Proposition of Law No. 22[:] Irrelevant and inflammatory testimony about the victim's character is inadmissible at the culpability phase of a capital case and is a violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Sections 2, 9, 10 and 16, Article I of the Ohio Constitution.

{¶ 79} "Proposition of Law No. 23[:] Evidence presented at Mr. Berry's capital trial was insufficient to convict him of aggravated burglary, and therefore his conviction and death sentence deprived him of substantive and procedural due process as guaranteed by the Eighth, Ninth, and Fourteenth Amendments to the United States Constitution, as well as Article I, Sections 1, 16 and 10 of the Ohio Constitution.

{¶ 80} "Proposition of Law No. 24[:] [A] [t]rial judge may not unnecessarily highlight the unsworn nature of a capital defendant's statement to the jury at the penalty phase of the trial.

{¶ 81} "Proposition of Law No. 25[:] The jury is mislead [sic, misled], about its pivotal role in the sentencing scheme by being instructed that its verdict is merely a recommendation and that the trial court will conduct additional proceedings.

{¶ 82} "Proposition of Law No. 26[:] When a prosecutor fails to conform his conduct to meet the requirements of the law, a defendant is denied his due process right to a fair trial, and in a capital case the defendant is denied his right to a reliable sentence determination, in violation of the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution and Article I, Section[s] 2, 5, 9, 10, 16 and 20 of the Ohio Constitution.

{¶ 83} "Proposition of Law No. 27[:] Trial counsel's failure to present a defense, failure to object, failure to investigate and failure to timely raise the issue

of a capitally charged defendant's competency at the time of the crime, at the time of the defendant's confession, and at the time of both phases of the trial deprived defendant of the effective assistance of counsel, and of a fair trial and resulted in an inappropriate and unreliable sentence of death in violation of the rights guaranteed by the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution and Article I, Section[s] 2, 5, 9, 10, 16 and 20 of the Ohio constitution.

{¶ 84} "Proposition of Law No. 28[:]  The failure to raise or adequately address substantial capital and other well-established criminal law issues on appeal as of right deprives the capital defendant of the effective assistance of appellant [sic, appellate] counsel and the meaningful appellate review of a capital conviction guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution, Article I, Sections 10 and 16 of the Ohio Constitution and O.R.C. Section 2929.05.

{¶ 85} "Proposition of Law No. 29[:]  When an appellate court makes its independent de novo review of the appropriateness of a capital defendant's death sentence, it is acting as a sentencer within the meaning of the Eighth Amendment, and therefore its determination must be unanimous.

{¶ 86} "Proposition of Law No. 30[:]   The Fifth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution, Sections 2, 9, 10, and 16, Article I of the Ohio Constitution and Ohio Revised Code, Section 2929.05 guarantee that a convicted capital defendant receive a fair and impartial review of his death sentence.  The statutorily mandated proportionality review process in Ohio does not comport with this constitutionally mandated requirement and thus is fatally flawed.

{¶ 87} "Proposition of Law No. 31[:]  Ohio employs a mandatory capital sentencing scheme which prevented the jury from deciding whether death was the appropriate punishment in violation of the Fifth, Sixth, Eighth, Ninth and

Fourteenth Amendments to the United States Constitution and Sections 2, 9, 10, and 16, Article I of the Ohio Constitution.

{¶ 88} "Proposition of Law No. 32[:]   The Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Sections 2, 9, 10 and 16, Article I of the Ohio Constitution establish the requirements for a valid death penalty scheme.   Ohio Revised Code, Section[s] 2903.01, 2929.02, 2929.021, 2929.022, 2929.023. 2929.03, 2929.04 and 2929.05, Ohio's statutory provisions governing the imposition of the death penalty, do not meet the prescribed constitutional requirements and are unconstitutional, both on their face and as applied."