[Cite as *State v. Henry*, 2018-Ohio-2902.]

COURT OF APPEALS
MUSKINGUM COUNTY, OHIO
FIFTH APPELLATE DISTRICT


| | | |
|---|---|---|
| STATE OF OHIO | : | JUDGES: |
| | : | Hon. John W. Wise, P.J. |
| Plaintiff-Appellee | : | Hon. Patricia A. Delaney, J. |
| | : | Hon. Earle E. Wise, Jr., J. |
| -vs- | : | |
| | : | |
| LORI J. HENRY | : | Case No. CT2017-0054 |
| | : | |
| Defendant-Appellant | : | O P I N I O N |


CHARACTER OF PROCEEDING:        Appeal from the Court of Common
                               Pleas, Case No. CR2016-0325



JUDGMENT:                      Affirmed



DATE OF JUDGMENT:              July 23, 2018



APPEARANCES:

For Plaintiff-Appellee                For Defendant-Appellant

GERALD V. ANDERSON, II                ERIC J. ALLEN
27 North Fifth Street                 4605 Morse Road
P.O. Box 189                          Suite 201
Zanesville, OH  43702-0189            Gahanna, OH  43230

*Wise, Earle, J.*

{¶ 1}   Defendant-Appellant, Lori J. Henry, appeals her July 26, 2017 conviction by the Court of Common Pleas of Muskingum County, Ohio.  Plaintiff-Appellee is the state of Ohio.

### FACTS AND PROCEDURAL HISTORY

{¶ 2}   On October 20, 2016, the Muskingum County Grand Jury indicted appellant on one count of child endangering in violation of R.C. 2919.22, one count of trafficking in persons in violation of R.C. 2905.32, and one count of compelling prostitution in violation of R.C. 2907.21.  Said charges arose from incidents involving appellant's eight year old child, K.H.

{¶ 3}   A jury trial commenced on June 13, 2017.  The jury found appellant guilty as charged.  By judgment entry filed July 26, 2017, the trial court sentenced appellant to an aggregate term of fifteen years in prison.

{¶ 4}   Appellant filed an appeal and this matter is now before this court for consideration.  Assignments of error are as follows:

I

{¶ 5}   "THE TRIAL COURT'S FAILURE TO HOLD A COMPETENCY HEARING WHEN ISSUES REGARDING APPELLANT'S COMPETENCY AROSE PRIOR TO TRIAL VIOLATED R.C. 2945.37 AND R.C. 2945.371 AND DENIED APPELLANT DUE PROCESS OF LAW."

II

{¶ 6}   "THE VERDICT IN THIS CASE IS AGAINST THE SUFFICIENCY OF THE EVIDENCE AND SHOULD BE REVERSED BECAUSE IT VIOLATES THE FIFTH,

SIXTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND ARTICLE I, SECTION 10 OF THE CONSTITUTION OF THE STATE OF OHIO."

III

{¶ 7}   "THE VERDICT IN THIS CASE IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND SHOULD BE REVERSED BECAUSE IT VIOLATES THE FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND ARTICLE I, SECTION 10 OF THE CONSTITUTION OF THE STATE OF OHIO."

I

{¶ 8}   In her first assignment of error, appellant claims the trial court failed to hold a competency hearing.  We disagree.

{¶ 9}   R.C. 2945.37 governs competence to stand trial.  Subsection (B) states the following:

> In a criminal action in a court of common pleas, a county court, or a municipal court, the court, prosecutor, or defense may raise the issue of the defendant's competence to stand trial.  If the issue is raised before the trial has commenced, the court shall hold a hearing on the issue as provided in this section.  If the issue is raised after the trial has commenced, the court shall hold a hearing on the issue only for good cause shown or on the court's own motion.

{¶ 10} "A defendant is presumed to be competent to stand trial" unless the trial court finds after a hearing by a preponderance of the evidence that, "because of the defendant's present mental condition, the defendant is incapable of understanding the nature and objective of the proceedings against the defendant or of assisting in the defendant's defense." R.C. 2945.37(G).

{¶ 11} The record is clear that a motion for a competency evaluation and/or hearing was never made. Appellant is essentially arguing the trial court should have sua sponte held a hearing to determine her competency to stand trial pursuant to R.C. 2945.37(B) cited above.

{¶ 12} On May 22, 2017, the trial court held a hearing on appellant's request for new counsel. Defense counsel specifically stated the following (T. at 5):

I think the court is aware that Miss Henry is working at somewhat of a deficit, although I do feel that she is competent to stand trial, and I do believe that she's competent to assist me in her defense. I arrived at the decision after a lot of thought, but I believe that she is cognizant of what's going on, does take a lot of time to explain things to her thoroughly so that I'm satisfied that she is understanding me, but I'm willing to go put the time in to make sure that she does understand.

{¶ 13} Appellant indicated she understood what defense counsel had just said and did not have any problems going forward with said counsel. T. at 6. We note defense counsel had represented appellant for six months prior to this hearing, giving him time to become familiar with appellant.

{¶ 14} On the morning of trial, the prosecutor informed the trial court of the following (June 13, 2017 T. at 8):

First, throughout the course of this case, I have had an opportunity to speak with Defense Attorney Grosshandler via email regarding his perceptions of Lori Henry's competency. He indicated to me on several occasions that he is confident that she is competent and understands everything that's going on, that there are no issues with her regarding that, regarding the process.

{¶ 15} The trial court asked defense counsel if the prosecutor's statements were accurate to which defense counsel responded as follows (*Id.* at 9):

Yes, Your Honor. I believe that I've gone over the record previously and explained my thinking with regard to her competency. I do believe that she has been an assistance to counsel. We've had meaningful conversations about the facts of this case.

Additionally, I do believe that she does have rudimentary understanding of - - of the process. I do believe that through our conversations she does understand what we're doing here.

{¶ 16} In *State v. Berry,* 72 Ohio St.3d 354, 359, 650 N.E.2d 433, the Supreme Court of Ohio stated the following:

In *Dusky v. United States* (1960), 362 U.S. 402, 80 S.Ct. 788, 789, 4 L.Ed.2d 824, 825, the United States Supreme Court set forth the test to determine whether a defendant is competent to stand trial, stating that " * * * the 'test must be whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him.' "  See, also, *Drope* [*v. Missouri* (1975), 420 U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103]*, supra,* 420 U.S. at 172, 95 S.Ct. at 904, 43 L.Ed.2d at 113.  The right to a hearing on the issue of competency rises to the level of a constitutional guarantee where the record contains "sufficient indicia of incompetence," such that an inquiry into the defendant's competency is necessary to ensure the defendant's right to a fair trial.  See *Drope, supra,* 420 U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103; *Pate, supra,* 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815; and *State v. Bock* (1986), 28 Ohio St.3d 108, 110, 28 OBR 207, 209, 502 N.E.2d 1016, 1018-1019.

{¶ 17} We find nothing in the record to indicate a "sufficient indicia of incompetence."  Defense counsel informed the trial court that appellant was able to assist him and was cognizant of what was going on.  She was able to engage in meaningful conversations about the facts of the case.

{¶ 18} Upon review, we find the trial court did not err in failing to sua sponte hold a competency hearing.

{¶ 19} Assignment of Error I is denied.

II, III

{¶ 20} In these assignments of error, appellant claims her conviction for compelling prostitution of her child, K.H., was against the sufficiency and manifest weight of the evidence. We disagree.

{¶ 21} On review for sufficiency, a reviewing court is to examine the evidence at trial to determine whether such evidence, if believed, would support a conviction. *State v. Jenks,* 61 Ohio St.3d 259, 574 N.E.2d 492 (1991). "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Jenks* at paragraph two of the syllabus, following *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

{¶ 22} On review for manifest weight, a reviewing court is to examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine "whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Martin,* 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). See also, *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997). The granting of a new trial "should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *Martin* at 175.

{¶ 23} Appellant challenges her conviction for compelling prostitution in violation of R.C. 2907.21(A)(2)(a) which states: "No person shall knowingly do any of the following: Induce, procure, encourage, solicit, request, or otherwise facilitate either of the following:

A minor to engage in sexual activity for hire, whether or not the offender knows the age of the minor."

{¶ 24} "Sexual activity" means sexual conduct or sexual contact or both. R.C. 2907.01(C). R.C. 2907.01(A) defines "sexual conduct" as:

[V]aginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another. Penetration, however slight, is sufficient to complete vaginal or anal intercourse.

{¶ 25} "Sexual contact" means "any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person." R.C. 2907.01(B).

{¶ 26} Courtney Kerns-Huffman, Ph.D, testified as an expert in the area of clinical counseling and school counseling. T. at 264. Dr. Kerns-Huffman was employed by the school attended by the victim, K.H. K.H. exhibited poor behavior throughout her years at the school. T. at 266. On September 21, 2016, K.H. destroyed a classroom. Dr. Kerns-Huffman was called to the classroom as she had "established so much rapport with her over the years." T. at 267. K.H. was "very fearful, extremely escalated, extremely agitated, tearful" and stated she was "scared for me and my mommy and my daddy." T.

at 269-270. K.H. explained, "I have to help my mommy make money" and "I have a boyfriend." T. at 270. When asked why she had a boyfriend, K.H. stated "it was a necessary thing because she needed to help her mom and dad make money, that they needed the money." T. at 270-271. K.H. stated the boyfriend likes to "kiss me" and "he does bad things to me" while he is naked. T. at 271. K.H. called this man "Pan Man." T. at 272. She told Dr. Kerns-Huffman that she hated Pan Man and described what would happen after her mommy dropped her off at his apartment. T. at 272-274. K.H. stated when her mommy picked her up, Pan Man would give appellant money. T. at 274-275. Dr. Kerns-Huffman testified (T. at 275):

> She was very clear in stating that the only time that Mom would get money was after she stayed there, that he would not let her have money prior to that. She said that Mom would do running around for Pan Man while she stayed.
>
> After the exchange of money, Mom would take her into the Family Dollar and would let her pick out a baby doll or a toy that she liked because she felt that she had done something good for their family.

{¶ 27} K.H. told Dr. Kerns-Huffman upon arriving home, she "would hurry up and get in the bath because she felt gross and because she felt so uncomfortable and disgusting by what had happened." T. at 275. From this day forward after making these statements to Dr. Kerns-Huffman, K.H. did not exhibit any negative behaviors, was on grade level, and made a complete turnaround. T. at 276. Dr. Kerns-Huffman made a

report of the incident. *Id.* A couple weeks later in October, K.H. told Dr. Kerns-Huffman she felt safe now and her mommy "knew what was happening to me" because "we needed the money." T. at 277. Dr. Kerns-Huffman made a report of this conversation as well. T. at 277-278. The reports were not offered into evidence.

{¶ 28} K.H. testified, age nine at the time of trial. T. at 291. She stated her mom would take her to Pan Man's house. T. at 292. He would be naked and he would do things to her, but he did not touch her. *Id.* When asked if Pan Man ever gave mommy money, K.H. testified, "[p]robably a few dollars." T. at 293. She stated she told her Aunt Heather the "stuff" that Pan Man did, that he touched her in a bad place. T. at 293-294. On cross-examination, K.H. stated she told people about Pan Man, but it was not somebody at her school. T. at 295. She has seen her mommy receive money from her aunt and Pan Man. T. at 297. She admitted to telling Dr. Kerns-Huffman that she helped her mommy make money. T. at 299. She would have to go to Pan Man's house and run the vacuum cleaner to help mommy make money. T. at 299-300. Two witnesses for the defense and an expert hired by the defense acknowledged it was not unusual or uncommon for a child sexual abuse victim to not want to share and disclose sexual abuse incidents to others. T. at 350, 377, 415-416.

{¶ 29} Amanda Matthews, principal at K.H.'s school, testified to K.H.'s behaviors at the school before and after the September incident and corroborated Dr. Kerns-Huffman's testimony on K.H.'s behavior. T. at 303-309. Principal Matthews was present during the discussion between K.H. and Dr. Kerns-Huffman. T. at 308. As a result, Principal Matthews contacted the school resource officer and children services. *Id.*

{¶ 30} Muskingum County Sheriff's Deputy Tom Joseph was the school resource officer. He testified he was notified of K.H. disclosing sexual abuse. T. at 311. He took statements from Dr. Kerns-Huffman, Principal Matthews, and Superintendent Todd Whiteman who were all in the room during the disclosure. T. at 312. The statements were consistent in nature. *Id.*

{¶ 31} Following Deputy Joseph's testimony, the following stipulation was read to the jury (T. at 316):

> The parties would stipulate that Keith Edwards, if called as a witness, would testify that Larry McKee, who resided at 19 North Mound Street, Apartment 3B, in Frazeysburg, Ohio, entered a plea of guilty to four counts of gross sexual imposition, felonies of the third degree, on November 9th, 2016. In exchange for Larry McKee's plea and cooperation, the State agreed to dismiss one count of compelling prostitution, a felony of the third degree.

{¶ 32} Larry McKee is known to K.H. as Pan Man.

{¶ 33} Following this stipulation, the jury heard from Muskingum County Sheriff's Deputy Randy Wilson, one of the detectives on this case. Detective Wilson interviewed Heather Kazer, a friend of appellant's, aka "Aunt Heather." T. at 327. Ms. Kazer provided information consistent with the statements and disclosures made by K.H. T. at 328.

{¶ 34} Muskingum County Sheriff's Deputy Detective Fred Curry interviewed appellant. He informed appellant of K.H.'s statements and disclosures and she was

"shocked." T. at 334. She stated she did not drop off K.H. at Pan Man's house, but mentioned something about K.H. being there cleaning carpets. *Id.* She then admitted to dropping off K.H. at his apartment. T. at 335. She stated K.H. never stayed overnight. *Id.* Detective Curry located Mr. McKee and spoke to him. T. at 337. At first Mr. McKee denied that anything happened with K.H. T. at 338. Following a police interview, Mr. McKee "confessed to abusing" K.H. and was subsequently arrested and charged. T. at 338-339. After Mr. McKee's confession, the investigation turned to appellant because of Dr. Kerns-Huffman's report wherein K.H. made "additional disclosure that she had told her mom what had been going on and her mom said something to the effect that they needed the money." T. at 339. The report was forwarded to the prosecutor's office. *Id.*

{¶ 35} Drew Barzman, M.D., testified as an expert in forensic psychiatry as well as child and adolescent psychiatry. T. at 346. He was called by the state. Dr. Barzman was asked by defense counsel to evaluate the case to see whether there was validity to appellant "being knowledgeable about payment for suspected abuse." T. at 346-347. Dr. Barzman examined numerous reports, records, and letters. T. at 348-350, 354-355. He testified K.H. exhibited signs that were indicative of behaviors of a sexual abuse victim such as behavioral problems and sexualized behaviors. T. at 350-351, 353-354. He explained it was not uncommon for a child sexual abuse victim to not feel comfortable disclosing to everyone. T. at 350. In his report, Dr. Barzman noted "letters from Dr. Courtney Huffman provided detailed information related to Miss Henry's knowledge of the sexual abuse and payment for such." T. at 357; State's Exhibit 4. Dr. Barzman testified from Dr. Kern-Huffman's interview letters, he could gather "enough detail to understand what was going on during that initial interview." T. at 349. Her questions to K.H. were

appropriately open-ended.  *Id.*  On cross-examination, Dr. Barzman testified he felt the information provided by Dr. Kerns-Huffman was credible.  T. at 360.

{¶ 36} Following Dr. Barzman's testimony, the state rested.  The defense called Laine Davis, an assessment investigator with Muskingum County Adult and Child Protective Services.  She interviewed K.H. at the school the day before the September incident due to reports of uncleanliness.  T. at 369-370.  When asked, K.H. denied that anybody had touched her in a bad way.  T. at 370-371.

{¶ 37} Roni Kuhn, an assessment caseworker with Muskingum County Adult and Child Protective Services, interviewed K.H. about an hour after the September incident at school.  K.H. did not disclose anything to Ms. Kuhn.  T. at 373-374.  Ms. Kuhn admitted it was not unusual or uncommon for a child sexual abuse victim to not want to share traumatic information over and over again with people.  T. at 377.

{¶ 38} Larry McKee, age 76, took the stand.  When asked if he ever gave appellant money for bringing K.H. over to his apartment, he stated, "[n]ever did."  T. at 390-391.  He admitted to giving her money for other things like cigarettes.  T. at 391.  He gave appellant a "loan" of twenty dollars which she still owes.  *Id.*  On cross-examination, Mr. McKee testified appellant dropped off K.H. to his home and K.H. would spend the night.  T. at 392.  He admitted to touching K.H. in an inappropriate manner.  T. at 393-394.  He "loaned" money to appellant after she brought K.H. over.  T. at 394.  On redirect, Mr. McKee testified he never gave appellant money in front of K.H.  T. at 396.

{¶ 39} Jennifer Sherfield, a forensic interviewer and mental health advocate with Nationwide Children's Hospital, interviewed K.H. after the September incident.  K.H. did

not disclose any sexual abuse concerns. T. at 411. Ms. Sherfield explained "[n]ondisclosure doesn't mean abuse didn't happen." T. at 416.

{¶ 40} We note circumstantial evidence is that which can be "inferred from reasonably and justifiably connected facts." *State v. Fairbanks,* 32 Ohio St.2d 34, 289 N.E.2d 352 (1972), paragraph five of the syllabus. "[C]ircumstantial evidence may be more certain, satisfying and persuasive than direct evidence." *State v. Richey,* 64 Ohio St.3d 353, 1992-Ohio-44, 595 N.E.2d 915. It is to be given the same weight and deference as direct evidence. *State v. Jenks,* 61 Ohio St.3d 259, 574 N.E.2d 492 (1991). The trial court instructed the jury on circumstantial evidence and inferences. T. at 449.

{¶ 41} Dr. Kerns-Huffman testified to K.H.'s immediate statements following her disruptive behavior in the classroom. K.H. told Dr. Kerns-Huffman her mommy would drop her off at Pan Man's apartment, he would be naked and do bad things to her, and he would give appellant money afterwards. K.H. was concerned about helping mommy and daddy make money. Dr. Barzman acknowledged Dr. Kerns-Huffman's interview was appropriate. Several others corroborated K.H.'s statements and disclosures. K.H. testified she had seen Pac Man give appellant money. When interviewed by police, appellant admitted dropping off K.H. to Pan Man's apartment, but denied that K.H. spent the night. Mr. McKee testified K.H. did spend the night. He also stated he "loaned" appellant money that had yet to be repaid, but he never handed money to appellant in front of K.H.

{¶ 42} The weight to be given to the evidence and the credibility of the witnesses are issues for the trier of fact. *State v. Jamison,* 49 Ohio St.3d 182, 552 N.E.2d 180 (1990). The trier of fact "has the best opportunity to view the demeanor, attitude, and

credibility of each witness, something that does not translate well on the written page."

*Davis v. Flickinger,* 77 Ohio St.3d 415, 418, 674 N.E.2d 1159 (1997).

{¶ 43} From all the evidence presented, we find it could be reasonable for the jury to infer that appellant knowingly received money in exchange for dropping off K.H. at Pan Man's apartment to facilitate sexual activity for hire.

{¶ 44} Upon review, we find sufficient evidence to support the conviction for compelling prostitution, and do not find any manifest miscarriage of justice.

{¶ 45} Assignments of Error II and III are denied.

{¶ 46} The judgment of the Court of Common Pleas of Muskingum County, Ohio is hereby affirmed.

By Wise, Earle, J.

Wise, John, P.J. and

Delaney, J. concur.

EEW/db