[Cite as *State v. Grasso*, 2013-Ohio-1894.]

# Court of Appeals of Ohio

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

---

### JOURNAL ENTRY AND OPINION
### No. 98813

---

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## MARC GRASSO

DEFENDANT-APPELLANT

---

### JUDGMENT:
### AFFIRMED

---

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-560184

**BEFORE:**    Jones, P.J., Kilbane, J., and McCormack, J.

**RELEASED AND JOURNALIZED:**    May 9, 2013

**ATTORNEY FOR APPELLANT**

Paul Mancino, Jr.
75 Public Square
Suite 1016
Cleveland, Ohio 44113-2098


**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor

BY: Mary Weston
Assistant County Prosecutor
The Justice Center, 8th Floor
1200 Ontario Street
Cleveland, Ohio 44113

LARRY A. JONES, SR., P.J.:

{¶1} Defendant-appellant Marc Grasso appeals his conviction for multiple drug and arson offenses. We affirm.

<u>I. Procedural History and Facts</u>

{¶2} In 2012, Grasso was charged with five counts of aggravated arson and one count each of illegal manufacture of drugs, assembly or possession of chemicals for the purpose of manufacturing drugs, and drug possession. The matter proceeded to a bench trial, at which the following pertinent evidence was presented.

{¶3} Grasso lived with his girlfriend, codefendant Candace Needs,[1] in the basement of a Maple Heights home. The house was owned by Needs's grandparents, James Hargrove and Juanita Zicarelli. Hargrove was 93 years old at the time of the incident, confined to a wheelchair, and needed oxygen to facilitate his breathing. Zicarelli used oxygen at night. They lived on the main floor of the house with their son, Rick Faucett.

{¶4} The basement was equipped with a bedroom, bathroom, and kitchen. Neither of the grandparents ever went into the basement; Needs would do her grandparents' laundry for them and bring it upstairs so they did not have to go downstairs.

{¶5} On February 23, 2012, Grasso and Needs were in the basement with a friend, Nicole Kubinski. The grandparents and Faucett were also home. There was an

---

[1] Needs pleaded guilty to an amended indictment and was sentenced to a total of eight years in prison. *See State v. Needs*, Cuyahoga C.P. No. CR-560184-B.

explosion in the basement and the house caught on fire. All six people in the home were able to escape. Grasso suffered burns on his hands and Needs sought medical attention for burns to the trunk of her body and foot.

{¶6} The entire Maple Heights Fire Department ("M.H.F.D.") responded to the fire. Members of the Maple Heights Police Department and the Bedford Fire Department also responded. M.H.F.D. Lieutenant Vytautas Kavaliunas testified he arrived on the scene and noted smoke coming from the side door of the house, which led to the basement. Black smoke was pouring out of the eaves of the roof and there was heavy smoke in the first floor of the home.

{¶7} Lieutenant Kavaliunas testified that the fire originated in the basement, which made the fire "inherently dangerous" because of the lack of ventilation. According to Lieutenant Kavaliunas, he would expect that anyone in the basement at the time of the fire would suffer burns and damage to the face and nose from smoke inhalation. He further testified that it would only take a breath or two for someone in the home at the time of the fire to succumb to the effects of the carbon monoxide; the potential harm to a person with breathing difficulties was even greater.

{¶8} The firefighters noted that the stairwell going into the basement was extensively burned and the fire had accelerated into the first floor of the home and up into the attic. Lieutenant Kavaliunas testified he first became suspicious of the cause of the fire when he noticed that it appeared to originate in two different areas of the basement – in the kitchen and near a bed. The M.H.F.D. contacted the State Fire Marshal's office to

investigate.

{¶9} Brian Peterman, a state fire marshal, responded to the scene the next morning and immediately noticed several items in the basement that, to him, were indicative of a methamphetamine lab, or "meth" lab. He opined that the fire started when someone was making, or "cooking," methamphetamine.

{¶10} Peterman agreed that the fire originated in two places. He testified that someone tried to carry the container being used to make the drug into another area of the basement, which is how the second fire started, catching the mattress on fire. This movement of the container, according to Peterman, would burn a person's hands.

{¶11} Peterman opined that the fire was not an accident, because people who manufacture methamphetamine know they are creating a hazard that can cause fire.

{¶12} Peterman further testified that there was no evidence the fire was caused by cooking food, the production of methamphetamine is very toxic, and the fire could have totally destroyed the house if the fire department had not responded so quickly.

{¶13} Southeast Area Law Enforcement Bureau's ("SEALE") Detective Bill Gall secured a search warrant for the premises and arrived on the scene to collect evidence. Detective Gall took pictures and set about collecting evidence that, in his experience, is used to make methamphetamine. He observed and collected a melted plastic filter, coffee filters, glass jars, a measuring cup, a respirator, several plastic two-liter bottles, various paraphernalia used to ingest drugs, a can of Coleman fuel, plastic baggies, plastic tubing, a tourniquet, multiple packs of lithium batteries, multiple syringes, a can of

acetone, containers of drain cleaner, light bulbs modified into smoking devices, a digital scale, aluminum foil, and packets of cold medicine.

{¶14} Detective Gall also recovered various items from the garage: several plastic bottles with tubing and waste product leftover from methamphetamine production, empty packs of pseudoephedrine, store receipts, coffee filters, plastic tubing, an envelope addressed to Grasso that contained spent lithium battery strips, and an empty Coleman fuel can.

{¶15} Detective Gall testified that he recovered residue in some of the plastic baggies and suspected it was end-product methamphetamine. He field-tested the residue; the test came back positive for methamphetamine. He forwarded the baggies and additional objects for testing to the Ohio Bureau of Criminal Investigation ("BCI"). He then collected as much evidence as was safe but packaged the rest for destruction due to the hazardous nature of the material.

{¶16} BCI special agent Gary Miller testified for the state as an expert in methamphetamine production. He opined that the methamphetamine process that caused the fire was the "one-pot" method, in which a single container is used. He identified other ingredients found in the basement and garage that are used to make methamphetamine: pseudoephedrine, cold packs, drain cleaner, acetone or fuel, and lithium batteries.

{¶17} Miller explained the chemical process by which the drug is made. He described the bottles depicted in the photographs of the crime scene and explained how

they were used as gas generators as part of the cooking process.   Miller testified that one of the two-liter bottles showed residue from the cooking process, evidencing that methamphetamine had been produced at a previous time at this location.

{¶18} Miller testified that a user can use methamphetamine by smoking, snorting, eating, or injecting the drug.   If smoked, meth is usually smoked using a glass pipe, modified light bulbs or "foil canoes," such as those the police found in the basement of the Maple Heights house.   If the user is injecting the drug, he or she would use a syringe and a "tie-off" or tourniquet, like that which was found in the basement.

{¶19} Miller explained that because pseudoephedrine is an essential ingredient and because Ohio limits the amount a person can purchase, meth cookers often ask other people to buy pseudoephedrine for them; these straw buyers are referred to as "smurfs."

{¶20} Miller testified that although each individual ingredient used to produce methamphetamine may have an "innocent" use, he determined that the basement lab was a meth lab based on the "LQC" rule, which stands for "Location, Quantity, Combination." Because all of the components needed to produce methamphetamine, as well as inject and smoke the drug, were located in the basement in multiple quantities, the basement was both a meth lab and a place were the drug was used.

{¶21} The grandmother testified that she had lived at the Maple Heights home for 30 years.   On the night of the explosion, the grandmother was in bed with her breathing mask on when she heard a "big bang."   Grasso ran up and yelled there was a fire.   The grandmother ran outside.   Grasso picked up the grandfather, carried him outside, and

threw him on the ground.

{¶22} Local CVS pharmacy manager Brian Boyle testified that he reviewed pharmacy records and discovered that, on January 6, 2012, Grasso purchased pseudoephedrine, an ingredient used in making methamphetamine. Kubinski, who was in the basement at the time of the explosion, and her sister, Jamie, also purchased pseudoephedrine on three separate days in January and February 2012.

{¶23} In jailhouse recordings, Grasso admitted he lived at the Maple Heights home, had been burned in the fire, what happened was his fault, and he was sorry for hurting Needs's grandfather. He stated, "Tell [the grandfather] I'm sorry I injured him" and "It's my * * * fault. I shoulda just stuck to selling weed. None of us would be in any trouble." During a call to Needs, he told her to go try and recover any leftover batteries and that she did not deserve to go to jail because she did not do anything wrong. During one call he talked about one of their "smurf runs."

{¶24} The trial court convicted Grasso of all charges. The court ordered a psychiatric mitigation report and a presentence investigation report. At the sentencing hearing, the trial court merged the drug charges and the state elected to proceed to sentencing on the illegal manufacture of drugs count. The trial court sentenced Grasso to seven years in prison for the drug conviction to run consecutive to three years for the aggravated arson counts. The trial court ordered the aggravated arson counts to run concurrent to each other, for a total sentence of ten years in prison.

## II. Law and Analysis

**{¶25}** Grasso now appeals, raising the following assignments of error for our review, as quoted:

> I. The trial court erred in entering a verdict of guilty of aggravated arson on Counts 4, 5, 6, 7, and 8 of the indictment that was not supported by sufficient evidence, in violation of the Defendant's right to due process of law under the Fourteenth Amendment to the United States Constitution.
>
> II. The Defendant's sentence was contrary to law, and an abuse of discretion, in that the trial court imposed consecutive sentences without making the findings required by R.C. 2929.14(C)(4).
>
> III. Defendant was denied due process of law when the court improperly sentenced defendant in the absence of special findings when the verdict was announced.
>
> IV. Defendant was denied due process of law when he was convicted of offenses for which there was material variance.
>
> V. Defendant was denied effective assistance of counsel.

A.   Sufficiency of the Evidence

**{¶26}** In the first assignment of error, Grasso argues that his aggravated arson convictions were not supported by sufficient evidence.

**{¶27}** A challenge to the sufficiency of the evidence supporting a conviction requires the court to determine whether the state has met its burden of production at trial. *State v. Givan*, 8th Dist. No. 94609, 2011-Ohio-100, citing *State v. Thompkins*, 78 Ohio St.3d 380, 1997-Ohio-52, 678 N.E.2d 541.   On review for sufficiency, courts are to assess not whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction.   *Id.*

**{¶28}** The relevant inquiry is whether, after viewing the evidence in a light most

favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶29} Grasso was convicted of four counts of aggravated arson in violation of R.C. 2909.02(A)(1), which provides that "[n]o person, by means of fire or explosion, shall knowingly * * * [c]reate a substantial risk of serious physical harm to any person other than the offender." Grasso was also convicted of one count of aggravated arson in violation of R.C. 2909.02(A)(2), which provides that "[n]o person, by means of fire or explosion, shall knowingly * * * [c]ause physical harm to any occupied structure."

{¶30} Grasso contends that the state failed to show sufficient evidence that he acted "knowingly," i.e., the state failed to establish that Grasso knew his actions would probably result in a fire or explosion that created a substantial risk of serious physical harm to another person or caused physical harm to the house. The term "knowingly" is defined by R.C. 2901.22(B):

> A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist.

{¶31} We find that the state showed sufficient evidence that Grasso had knowledge that producing or cooking methamphetamine could probably result in a fire or explosion. BCI agent Miller testified that the process of producing methamphetamine is

volatile, and that certain ingredients are caustic, highly reactive. Part of the process "gets hot enough to ignite, burns 1,200 degrees." Methamphetamine producers "have a heat source. The vapors coming off of there are extremely volatile and dangerous." Miller explained how a methamphetamine cooker has to heat up a plastic container filled with solvents and alcohol as part of the cooking process. Part of the process is to create chemical reactions, "chemical heat." He further testified that the "reaction happens in the bottle. It's very volatile. It gets to rolling. The lithium metal will react and you'll see flames inside the [plastic] bottle."

{¶32} Miller explained how a one-pot cooking method can "fail," or catch on fire or explode. If the person making the drug does "burp the bottle," by repeatedly releasing the air from the bottle, it can "blow the top off and pieces come out and catch on fire." Or, he explained, the lithium

> gets trapped against the plastic down at the bottom or the side [of the bottle]. And the water, because it's getting generated, hits it and it burns at 1,200 degrees and melts the whole inside of the container. And since it's under pressure [it ignites.]

{¶33} Miller opined that the fire was caused by a meth lab based on both the burn patterns he saw in the evidence photographs and the vast amount of evidence that was collected from the scene that contained all the ingredients needed to manufacture the drug.

{¶34} Fire Marshall Peterson testified that when he entered the basement of the home and saw the Coleman fuel can, he immediately suspected that a meth lab had caught fire. He opined that Grasso sustained the burns to his hands trying to carry the "one-pot"

container from one area of the basement to the other after it caught fire. He also opined that the vapors or fumes that arise during methamphetamine production are "deadly," and there is a "fire" and "heated gas" that creates toxic smoke.

**{¶35}** When asked by the state what the potential dangers of methamphetamine production are, he stated that making meth is

> [v]ery dangerous with the amount of chemicals, such as the Coleman fuel, very flammable liquid, and then the use of those lithium batteries. The amount of lithium batteries that were collected [in the basement] could have totally destroyed the whole house if the fire department hadn't gotten there quickly.

He also explained that a person making the drug would use a respirator so as not to breathe in the vapors.

**{¶36}** When asked by defense counsel if the fire was an accident based on reckless production of the drug, Peterson answered:

> Peterson: I think that they know when they're creating or manufacturing the meth what the hazards are, what the dangers are in that.

> Defense Counsel: But the fire itself was an accident, you'll agree with me, in all fairness?

> Peterson: No, I'm not going to say that. They know when they're in there making meth they're creating that hazard. They're intentionally making an illegal substance, which created a hazard that caused fire.

**{¶37}** The propriety of an offender who operates a methamphetamine lab that catches fire being charged with arson appears to be a case of first impression in Ohio. In looking to other states, however, we found arson statutes that deal specifically with fires

caused by methamphetamine labs. *See* 569.040 R.S.Mo. (Missouri) ("A person commits the crime of arson in the first degree * * * [b]y starting a fire or explosion, damages a building or inhabitable structure in an attempt to produce methamphetamine"); Texas Pen. Code 28.02(a-1) ("A person commits an offense if the person recklessly starts a fire or causes an explosion while manufacturing or attempting to manufacture a controlled substance and the fire or explosion damages any building, habitation, or vehicle.")

{¶38} Further, the risk of fire from methamphetamine production is evident in Ohio law. R.C. 2933.33(A) provides:

> If a law enforcement officer has probable cause to believe that particular premises are used for the illegal manufacture of methamphetamine, for the purpose of conducting a search of the premises without a warrant, the risk of explosion or fire from the illegal manufacture of methamphetamine causing injury to the public constitutes exigent circumstances and reasonable grounds to believe that there is an immediate need to protect the lives, or property, of the officer and other individuals in the vicinity of the illegal manufacture.

{¶39} "It is clear that the legislature has deemed the very real threat of explosion and fire due to the volatility of the materials used to produce methamphetamine a sufficient enough threat to justify warrantless searches." *State v. Sandor*, 9th Dist. No. 23353, 2007-Ohio-1482, ¶ 11. We discuss this issue more under the fifth assignment of error; at this juncture, we find the statute instructive as it shows the legislature's

knowledge of the risk of fires incident to methamphetamine production.

**{¶40}** Based on the above testimony, there was sufficient evidence to support that Grasso knowingly engaged in an activity that would probably cause a fire, i.e., producing methamphetamine. Not only were the ingredients used in cooking the drug highly flammable, but part of the process in making the drug is to create an actual fire inside a plastic bottle. Moreover, there were multiple vessels found in the basement and garage that evidenced that prior batches of methamphetamine had been produced in the basement of the house.

**{¶41}** In light of the above, the arson convictions were supported by sufficient evidence. The first assignment of error is overruled.

### B. Sentencing

**{¶42}** In the second assignment of error, Grasso argues that the trial court erred in sentencing him to consecutive terms of incarceration.

**{¶43}** R.C. 2929.14(C)(4) provides that if multiple prison terms are imposed on an offender for convictions of multiple offenses, the trial court may require the offender to serve the prison terms consecutively if (1) the court finds that the consecutive sentence is necessary to protect the public from future crime or to punish the offender; (2) that the consecutive sentence is not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public; and (3) if the court also finds any of the following:

> (a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed

pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

R.C. 2929.14(C)(4)(a)-(c).

**{¶44}** Thus, a sentencing court must analyze whether consecutive sentences are necessary to protect the public or punish the offender, are not disproportionate, and make one additional finding listed in R.C. 2929.14(C)(4)(a)-(c).

A trial court satisfies this statutory requirement when the record reflects that the court has engaged in the required analysis and has selected the appropriate statutory criteria.

*State v. Goins*, 8th Dist. No. 98256, 2013-Ohio-263, ¶ 10, citing *State v. Edmonson*, 86 Ohio St.3d 324, 326, 1999-Ohio-10, 715 N.E.2d 131.

**{¶45}** In making these findings, a trial court is not required to use "talismanic words to comply with the guidelines and factors for sentencing." *Goins* at *id.*, citing *State v. Brewer*, 1st Dist. No. C-000148, 2000 Ohio App. LEXIS 5455, *10 (Nov. 24, 2000). But it must be clear from the record that the trial court actually made the findings required by statute. *Goins* at *id.* A trial court satisfies this statutory requirement when the record reflects that the court has engaged in the required analysis and has selected the

appropriate statutory criteria. *Id.*

**{¶46}** An appellate court must conduct a meaningful review of the trial court's sentencing decision. *State v. Johnson*, 8th Dist. No. 97579, 2012-Ohio-2508, ¶ 6, citing *State v. Hites*, 3d Dist. No. 6-11-07, 2012-Ohio-1892. R.C. 2953.08(G)(2) provides that an appellate court must "review the record, including the findings underlying the sentence or modification given by the sentencing court." *Johnson* at *id.* If an appellate court clearly and convincingly finds either that (1) "the record does not support the sentencing court's findings under [R.C. 2929.14(C)(4)]" or (2) "the sentence is otherwise contrary to law," then "the appellate court may increase, reduce, or otherwise modify a sentence * * * or may vacate the sentence and remand the matter to the sentencing court for resentencing." *Id.*

**{¶47}** In the case at bar, the trial court stated:

This is a very serious case. * * * It should not come as a surprise to anyone that meth labs explode.

* * *

[Counts 4, 5, 6, 7, and 8 will be] concurrent with each other,

but consecutive to Count 1. The court does

find that to do otherwise would demean the

seriousness of the offense. Communities need

to be protected from explosions, especially

communities like Maple Heights where the

homes are very close together. It's not a farm

where the risk of igniting another residence of someone would be far less than here. I doubt that these lots are more than 50 feet wide in Maple Heights, maybe 70 at best. So they're in close proximity to innocent neighbors and, obviously there were innocent people in this house that, from all statements of counsel, didn't even know there was a meth lab going on in the basement of their house, elderly people.

{¶48} These statements amount to a finding that consecutive sentences are not disproportionate to the seriousness of Grasso's conduct and the danger he poses to the public. Thus, while the court did not use the precise language in the statute, the record reflects that the court engaged in the required analysis and selected the appropriate statutory criteria. *See State v. Drobny*, 8th Dist. No. 98404, 2013-Ohio-937; *Goins*, 8th Dist. No. 98256, 2013-Ohio-263 (finding the record offered evidence that the trial court fully engaged in the R.C. 2929.14(C)(4) analysis, even though specific findings were not stated on the record); *State v. Jackson*, 8th Dist. No. 98354, 2013-Ohio-372; *but see State v. Battle*, 8th Dist. No. 98294, 2013-Ohio-816 (trial court failed to expressly address the R.C. 2929.14(C)(4) factors and there was insufficient evidence in the record to show a reasoned consideration of the factors).

**{¶49}** That being said, trial courts can ensure compliance with the sentencing statutes by utilizing a worksheet and memorializing their findings from that worksheet on both the record and in the court's journal entry.

> Because a trial court speaks only through its journal, we have long approved the use of a sentencing-findings worksheet to document that the trial court has made the required findings.

*State v. Jones*, 8th Dist. No. 98371, 2013-Ohio-489, ¶ 47 (Gallagher, S., concurring), citing *State v. Alexander*, 1st Dist. Nos. C-110828 and C-110829, 2012-Ohio-3349.

**{¶50}** Grasso also argues that the trial court failed to give reasons to support its findings. But the General Assembly deleted R.C. 2929.19(B)(2)(c) in H.B. 86; this was the provision in S.B. 2 that had required sentencing courts to state their reasons for imposing consecutive sentences on the record. *State v. Simonoski*, 8th Dist. No. 98496, 2013-Ohio-1031, ¶ 20. Accordingly, a trial court is not required to articulate and justify its findings at the sentencing hearing. *Id.*

**{¶51}** The second assignment of error is overruled.

C.   Indictment and Verdict

**{¶52}** In the third assignment of error, Grasso claims that the trial court erred in returning its verdict without placing on the record that the type of drug involved was methamphetamine, as opposed to marijuana.

**{¶53}** This argument lacks merit. The trial court announced its verdict on the record. The trial court was not required to fill out verdict forms as there are no verdict forms in a bench trial. *See State v. Sims*, 8th Dist. No. 89621, 2007-Ohio-6821, ¶ 19.

**{¶54}** The court was also not required to specify the type of drug as the state alleged the type of drug in the indictment. Although the fire marshal testified he saw something that appeared to be marijuana in the basement, no marijuana was seized or tested, and Grasso was not charged in this indictment with any marijuana-related crimes.

**{¶55}** The third assignment of error is overruled.

D. Date of Offense

**{¶56}** In the fourth assignment of error, Grasso argues that he was denied due process of law because there was no evidence that he committed the offense on February 23, 2012, as charged in Count 2 of the indictment.

**{¶57}** Count 2 of the indictment charged that on or about February 23, 2012, in violation of R.C. 2925.041(A), Grasso "did knowingly assemble or possess one or more chemicals that may be used to manufacture a controlled substance in schedule I or II with the intent to manufacture a controlled substance in schedule I or II, to wit, methamphetamine."

**{¶58}** Grasso claims that he could not be convicted of this count because the only evidence the state offered showing Grasso purchased materials to make methamphetamine was a January 6, 2012 receipt for pseudoephedrine. But the state provided ample evidence that Grasso possessed, either personally or constructively, the ingredients needed to make methamphetamine and was, in fact, in possession of the ingredients on February 23, 2012, when the explosion occurred. R.C. 2925.041(B) only requires assembly or possession of a single chemical necessary in the manufacture of a

controlled substance, but here, the police and fire marshal recovered all the ingredients from the basement and garage that are necessary to make methamphetamine.

{¶59} The fourth assignment of error is without merit and overruled.

E.   Ineffective Assistance of Counsel

{¶60} In the fifth and final assignment of error, Grasso claims he was denied effective assistance of trial counsel.

{¶61} To establish ineffective assistance of counsel, a defendant must demonstrate that counsel's performance fell below an objective standard of reasonable representation and that he was prejudiced by that performance. *State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, ¶ 205, citing *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Prejudice is established when the defendant demonstrates

> a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Strickland* at 694.

{¶62} In evaluating a claim of ineffective assistance of counsel, a court must be mindful that there are countless ways for an attorney to provide effective assistance in a given case, and it must give great deference to counsel's performance. *Id.* at 689. Trial tactics and strategies do not constitute a denial of effective assistance of counsel. *State v. Gooden*, 8th Dist. No. 88174, 2007- Ohio-2371, ¶ 38, citing *State v. Clayton*, 62 Ohio St.2d 45, 402 N.E.2d 1189 (1980).

**{¶63}** Grasso claims counsel was ineffective for (1) failing to file a motion to suppress; (2) not seeking a mental evaluation of him; and (3) failing to object to the jailhouse recordings and certain witness testimony.

### i.  Motion to Suppress

**{¶64}** Grasso argues that his counsel should have filed a motion to suppress the warrantless search of the house.

**{¶65}** It is well established that firefighters and police are authorized to remain on the scene for a reasonable time to investigate the cause, origin and circumstances of the fire. *State v. Behrens*, 8th Dist. No. 63837, 1993 Ohio App. LEXIS 5549, *9 (Nov. 18, 1993), citing *Michigan v. Clifford*, 464 U.S. 287, 104 S.Ct. 641, 78 L.Ed.2d 477 (1984). In fact, pursuant to R.C. 3737.24, a fire marshal has two days, not including Sunday, to begin his or her investigation of a fire.

**{¶66}** Lieutenant Kavaliunas testified that he became suspicious of the fire because it appeared to originate in two different places in the basement.  The fire department boarded up the house and secured the scene until they could return in the daylight.  Fire Marshal Peterman responded to the scene and contacted members of SEALE, who obtained a search warrant for the premises.  Thus, the additional search and the seizure of all items was pursuant to a warrant.

**{¶67}** Moreover, we realize the danger to the community that a meth lab poses. The Ohio legislature, in enacting R.C. 2933.33(A), has recognized the potential exigencies, independent of those of a fire, created by an illegal methamphetamine

laboratory.

**{¶68}** Based on these facts, the trial court would likely have denied any motion to suppress the evidence seized from the premises. Thus, Grasso fails to demonstrate that his counsel was ineffective on this basis.

ii.    Competency Evaluation

**{¶69}** Next, Grasso claims his attorney was ineffective for failing to request a competency evaluation.

**{¶70}** A defendant is presumed to be competent to stand trial unless proof by a preponderance of the evidence is presented as to the defendant's incompetency. *State v. Berry*, 72 Ohio St.3d 354, 360, 1995-Ohio-310, 650 N.E.2d 433. A defendant is legally incompetent if "incapable of understanding the nature and objective of the proceedings against [him] or of assisting in [his] defense[.]" R.C. 2945.37(G); *State v. Tibbetts*, 92 Ohio St.3d 146, 164, 2001-Ohio-132, 749 N.E.2d 226.

**{¶71}** A defendant has the right to a hearing on the issue of competency "where the record contains 'sufficient indicia of incompetence,' such that an inquiry into the defendant's competency is necessary to ensure the defendant's right to a fair trial." *Berry* at 359, citing *Drope v. Missouri*, 420 U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975). But defense counsel need not raise meritless issues or even all arguably meritorious issues. *State v. Taylor*, 78 Ohio St.3d 15, 31, 1997-Ohio-243, 676 N.E.2d 82.

**{¶72}** In this case, there was no indication Grasso had any mental health issues

until sentencing. The record also does not indicate that his mental health in any way affected his ability to assist in his own defense. Grasso has failed to demonstrate any prejudice or to show that had his counsel requested a competency evaluation that the results of his trial would have been different.

### iii.   Failure to Object

{¶73} Finally, Grasso claims that his counsel was ineffective for failing to object to the "inaudible" jailhouse recordings and for failing to object to the prosecutor's argument that Grasso's hands were burned.

{¶74} As to the jailhouse recordings, there is nothing in the record to indicate that they were inaudible. Moreover, in a bench trial, the trial court is presumed only to allow into evidence that evidence which is relevant and admissible. *State v. Gale*, 8th Dist. No. 94872, 2011-Ohio-1236, ¶ 22.

{¶75} As to whether Grasso's hands were burned, Grasso himself admitted on the jailhouse recordings that his hands indeed suffered burns. Thus, the prosecutor did not err in arguing the point, nor did defense counsel err in failing to object.

{¶76} In light of the above, Grasso was not afforded ineffective assistance of trial counsel.

{¶77} The fifth assignment of error is overruled.

{¶78} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

LARRY A. JONES, SR., PRESIDING JUDGE

MARY EILEEN KILBANE, J., and
TIM McCORMACK, J., CONCUR