[Cite as *State v. Pubill*, 2025-Ohio-5231.]

**COURT OF APPEALS OF OHIO**

**EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA**

STATE OF OHIO,                                    :

    Plaintiff-Appellee,                     :

                                                             No. 115018

    v.                                                     :

OSWALD PUBILL, JR.,                          :

    Defendant-Appellant.                   :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** November 20, 2025

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-23-687543-A

---

***Appearances:***

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Nicholas Fink, Assistant Prosecuting Attorney, *for appellee*.

Gregory T. Stralka, *for appellant*.

DEENA R. CALABRESE, J.:

{¶ 1} On March 11, 2025, a Cuyahoga County jury found defendant-appellant Oswald Pubill, Jr. ("appellant") guilty of one count of vandalism. The trial court entered judgment in accordance with the jury's verdict and imposed a 12-month prison term and two years of postrelease control. Appellant timely appealed,

arguing that the trial court erred by proceeding to trial without determining whether he was competent. Finding no merit to the appeal, we affirm.

## I.    Facts and Procedural History

{¶ 2} Appellant does not dispute the facts underlying his conviction. On December 8, 2023, he entered the Federal Reserve Bank located at 1455 East 6th Street in Cleveland, Ohio, carrying a padlock placed in a sock. Without delay, and in full view of federal law enforcement personnel and a security camera, appellant swung the sock twice at an emergency door fitted with ballistic glass (commonly referred to as bulletproof glass). A senior officer and his colleagues rapidly subdued appellant, and Cleveland police arrested him. Appellant's acts left marks on the ballistic glass, which was later replaced at considerable expense.

{¶ 3} On December 13, 2023, the Cuyahoga County Grand Jury returned a one-count indictment charging appellant with vandalism in violation of R.C. 2909.05, a felony of the fifth degree.

{¶ 4} Appellant posted bond and was released, but failed to appear for a scheduled discovery hearing, leading to a capias and his subsequent arrest just over five months later. He remained in custody thereafter. Additional pretrial discovery and multiple pretrial conferences followed.

{¶ 5} On October 9, 2024, the trial court held an attorney conference to address appellant's failure to cooperate in proceedings and his history of difficult behavior. In a journal entry memorializing the attorney conference, the court wrote:

> Defendant has thus far refused to be brought to court, and refused jail and electronic visits with his attorney.

The court has reviewed previous cases and North Coast. Defendant has a history of refusal, non-compliance, and courtroom misbehavior, which North Coast found to be volitional and not related to any issue of incompetence or mental health deficiencies.

{¶ 6} The trial court formally addressed appellant's competency at a hearing conducted on October 17, 2024. Appellant was present with counsel. The trial court reviewed appellant's behavior in jail in connection with the present case and appellant's history of being found competent to stand trial. This included a review of appellant's most recent competency evaluation in 2022, which this court referenced in *State v. Pubill*, 2023-Ohio-3875 (8th Dist.).

{¶ 7} Sheriff's Department Sergeant Jerman told the court that while appellant was not combative, he was uncooperative, essentially going limp, extending his middle finger, and refusing to cooperate with transport. An assistant prosecutor recounted appellant's behavior at his last trial, noting that "he refused to dress or cooperate, similar to the fashion that he is now." (Tr. 6.) The prosecutor noted that "it's the same behavior that you're seeing today and that we're hearing about." (Tr. 6.) Appellant's counsel indicated that he tried to meet with appellant at least five times without success, i.e., that appellant refused to meet with him.[1]

{¶ 8} The trial court, on the record, then extensively reviewed appellant's long history of being found competent to stand trial, relying principally on the

---

[1] With respect to these attempted jail visits, counsel suggested he was relying on reports of jail staff that appellant was unwilling to meet, stating, for example, that "[a]llegedly he refused" to meet or that appellant "supposedly refused" to meet. (Tr. 6-7.) At least twice, however, counsel plainly stated that appellant "refused" to meet with him. (Tr. 7.)

competency report dated June 22, 2022, prepared by Northcoast Behavioral Health ("NBH") in connection with Cuyahoga C.P. No. CR-22-667981. The trial court stated at the outset that upon its review of the report, it did not "believe that another referral would be — produce anything different" and that it would "explain why." (Tr. 9.)

{¶ 9} The June 2022 report, according to the trial court and our independent review, noted that appellant underwent two separate competency evaluations in 2012, one in connection with Cuyahoga C.P. No. CR-12-562768-A and another in Cuyahoga C.P. No. CR-12-562805, and that he was found competent in both matters. Appellant had additional criminal cases in 2013 and 2015 where the issue of competency was not raised. In 2016, 2019, and 2022, appellant was referred to the court psychiatric clinic and then to NBH. He was found to be competent in each case.

{¶ 10} Still referencing the June 2022 report, the trial court noted that during his 2019 admission at NBH, appellant reportedly expressed cynicism regarding the court system. He demanded that staff make copies of paperwork for him and was observed bullying other patients. The evaluating physician reviewed jail phone records of four phone calls in which appellant "demonstrated organized thoughts and speech[.]" (Tr. 12.) During his stay, he did not report any auditory hallucinations or make any delusional statements. The evaluating physician did not assign a psychiatric diagnosis and "opined that he could understand the nature and objective of the court proceedings and of assisting in his defense." (Tr. 13.)

{¶ 11} According to the June 2022 report, as quoted or paraphrased by the trial court, records relating to his December 2020 stay at Northwest Ohio Psychiatric Hospital ("NOPH") indicted he was uncooperative. He was "diagnosed with unspecified mood disorder" and there was "concern that he may have cluster A personality disorder." (Tr. 13.)[2] Generally, however, he was "appropriately behaved," at least up to the point where he refused to comply with COVID testing. (Tr. 13-14.) "He was ultimately discharged back to jail." (June 22, 2022 NBH report at p. 6.)

{¶ 12} In connection with the 2022 criminal proceeding, appellant refused to cooperate with the court psychiatric clinic and was again admitted to NBH, this time from June 1, 2022, to June 16, 2022. At the outset he was uncooperative, refusing to exit the sheriff transport van and requiring "manual extraction." (Tr. 14.) He was likewise uncooperative with admission protocols and "repeatedly stated that he did not consent to services." (Tr. 14.) When he spoke, however, "he was organized and logical in his thinking. He made no paranoid or delusional statements and did not appear to be responding to hallucinations." (Tr. 14.) He indicated to the evaluating physician that he understood the doctor's "general role" and "remembered being at NBH in the past[.]" (Tr. 14-15.) Nevertheless, "[e]ach time [the doctor] approached

---

[2] The report reads: "He was diagnosed with Unspecified Mood Disorder, but he refused any medications. There was concern that he may have a Cluster A personality disorder after he made odd statements about competency and called himself by a different name in group." (June 22, 2022 NBH report at p. 5.)

him he held up his hands and said no thank you and [that he] did not consent to services." (Tr. 15; June 22, 2022 NBH report at p. 6.)

{¶ 13} Appellant told staff that "he had to stand [his] ground," but he was "competent and . . . ready to go." (Tr. 15.) He told staff that he would not "act like that anymore" and "would do whatever [they] need [him] to do," which indicated to the evaluating physician "that his behavior prior was volitional." (Tr. 15.) He was thereafter polite to staff and peers, though he continued to refuse to meet with the physician for evaluation.

{¶ 14} The evaluating physician indicated appellant was "able to advocate for his own needs" by asking for toiletries and other items. He was able to attend to the activities of daily living, including personal hygiene and dressing. Appellant spent time "socializing with peers, playing board games and cards, and watching television and movies[.]" (Tr. 16.) This indicated to the evaluator that he could concentrate for extended periods. Appellant assisted with cleaning the common area.

{¶ 15} Notably, appellant "provided advice to his peers about how to get shortened sentences for charges by telling their psychiatrist that they could hear voices." (Tr. 16.)

{¶ 16} Appellant was involved in only one verbal conflict with a peer. The staff observed no other instances of aggression. "At no point was he observed to be responding to hallucinations. He was not observed to make any delusional statements or paranoid statements. He was consistently described as organized and coherent." (Tr. 17.)

{¶ 17} On June 13, 2022, the evaluating physician approached appellant during an activity and attempted to perform a competency evaluation. Appellant told the physician "he knew who I was and that he did not consent to having a competency assessment." (Tr. 17.) According to appellant, "he had come into the hospital competent and wanted to retain his competency." (Tr. 17.) Appellant was noted to exhibit organized thoughts, with no evidence of hallucinations or delusions. "No present mental condition was the diagnosis." (Tr. 17.)

{¶ 18} The evaluating physician considered whether appellant "had a psychotic disorder" based on a past diagnosis of "schizoaffective and bipolar disorder." (Tr. 17.) The physician rejected making a psychiatric diagnosis, however, observing that "while he was at NBH unmedicated he had displayed no objective signs of psychosis." (Tr. 18.) As the trial court summarized:

> So they went over absolutely all points and they summed up that you did not demonstrate any behaviors, any behaviors while you were in their presence and while you were at Northcoast that you had any schizoaffective, bipolar, any other mental health issues.

(Tr. 18.)

{¶ 19} The evaluating physician characterized appellant's obstructionist behavior as volitional and likely stemming from nonpsychotic reasons, "such as to try to hold up court proceedings." (Tr. 18.) His "lack of cooperation during this admission was not a product of [a] mental condition and was a volitional choice." (Tr. 19.) Furthermore, as the court summarized:

> It is that doctor's opinion with a reasonable degree of certainty that you do not have a present mental condition and you are able to understand the nature and objective of the legal proceedings. Mr. Pubill has

participated in legal proceedings numerous times in the past. He has engaged in plea bargaining multiple times. He indicates that he had knowledge and experience with courtroom proceedings. There's no indication that he has experienced an event in the intervening time that would cause him to lose that knowledge.

(Tr. 19.)

{¶ 20} The evaluating physician opined, to a reasonable degree of medical certainty, that appellant did not have a present mental condition and that he could both understand the nature and objective of the legal proceedings against him and was able to assist in his own defense.

{¶ 21} Following its exhaustive summary, the trial court addressed appellant directly:

> [Y]our behavior is completely volitional and I'm just not going to tolerate it. You can do what you want. You can sit there. You can try to obstruct. You can try to delay the process. I'm just not going to engage with it. Your history of this type of behavior is very well documented, not just this — in this MHDD eligibility, but with the jail staff, with the prosecutor's office, and even defense attorneys that have represented you and cases on appeal, the record in your other cases, transcripts.

(Tr. 21-22.)

{¶ 22} Defense counsel did not object to the trial court's reliance on the June 2022 competency evaluation. Nor did counsel suggest that any intervening event may have caused appellant to decompensate or that appellant exhibited new behaviors that would support an additional evaluation. Appellant did not offer any evidence or argument to rebut the presumption of competence or to suggest incompetence, even after the trial court informed him it would instruct the jury that his conduct was volitional and not the product of mental illness. While the record

indicates intransigence and displays of nonverbal disrespect, there is no indication that appellant made any outbursts at the competency hearing.

{¶ 23} The trial court asked defense counsel if he wanted to state anything for the record. Counsel did not formally request a new competency evaluation. Instead, counsel inquired: "Just for my clarity purposes, your Honor's not willing to entertain another competency evaluation and/or a 20-day stay at Northcoast?" (Tr. 24.) The trial court indicated it was "willing to do it," but emphasized that the record was "very, very clear." (Tr. 24-25.) It also noted the manpower expended and safety concerns in transporting appellant:

> I mean, if — I think that anybody looking at this record can see that this has been exhaustively — essentially this is what he wants. He wants to go and do this every single time. He wants to delay the process. He's actually counseled other defendants to feign mental health conditions to try to gain advantage in the system. I mean, that's documented.
>
> So my concern is at this point the safety of anybody at Northcoast, the safety of the deputies in having to transport him. I mean, everything that he's done is volitional so if you would like a — I'm not going to deny it, but, you know, maybe go over everything with — I know that you have a lot of mental health experts, so to speak, or people that deal with mental health on a daily basis. They can look it over and see if they think it's necessary. I don't think that it's necessary. We're just going to proceed as we are.
>
> Mr. Pubill, I just — I'm not going to tolerate this. We're just going to keep going. You're not going to have an opportunity to delay or use this type of behavior to gain an advantage over the system. It's been well documented. We understand how you'll proceed and how you attempt to delay the system and it's just not going to happen here.

(Tr. 25-26.)

{¶ 24} The record does not indicate that appellant's counsel requested any further competency evaluation after the October 17, 2024 hearing.

{¶ 25} The trial court held another hearing on January 8, 2025, after appellant commenced a hunger strike in county jail and the trial court was required to consider force-feeding him. The trial court began the hearing by describing appellant's demeanor: "[P]er your last appearance here, you're doing the same thing where you are keeping your head down and you are giving us the middle finger[.]" (Tr. 27.) It noted that it had previously explained to appellant that medical and mental-health professionals had reviewed his history, had evaluated him,

> and have all agreed that this is just willfulness and obstinance and you do not have any mental health issues that would prevent you from understanding the nature of the offenses and participating in your own defense. It's just that you refuse, and it's been well-documented throughout multiple cases and multiple stays at Northcoast.

(Tr. 27-28.) The trial court was also advised that there was evidence appellant was actually sneaking food; he had been caught smuggling a packet of peanut butter tucked into his cheek.

{¶ 26} Appellant had again refused to dress for the hearing, and the trial court again found that appellant's behavior was "obstructionist," "willful," and "voluntary." (Tr. 35.) It advised appellant that it planned to proceed to trial and that if appellant wished to present himself to a jury in this manner, it was entirely "by his choice." (Tr. 38.) The court stated: "I am giving you an opportunity to weigh in here and make a different decision, and you have raised your middle finger even higher in response to that." (Tr. 38.) The trial court ultimately ordered that

appellant could be fed by force if necessary. At no point did appellant request to be heard further on competency.[3]

{¶ 27} Trial commenced on March 10, 2025. The trial court stated that it had reviewed the transcript of appellant's 2022 trial as a "roadmap" for managing his behavior. (Tr. 45.) After noting that appellant was again raising his middle finger to the court, the trial court referenced the earlier trial transcript, where "the judge, again, noted that he has his middle finger up." (Tr. 45.) The trial court further summarized competency issues in the 2022 case and how appellant's behavior in the present action paralleled those. This included his apparent "beliefs regarding sovereign citizenship," which this court had noted in its 2023 opinion and which were reiterated in appellant's letters to the trial court in the present action. (Tr. 47-48.) The trial court noted his "long letters" with "quite good handwriting," and reiterated that it found appellant competent. (Tr. 48.) It also stated that in the 2022 case, the trial court "noted your behavior as we see right now at another point in time was consistent except for when the jury came in. Mr. Pubill then started verbal outbursts when the jury came in." (Tr. 48.) The trial court emphasized that "[t]here's a noted history from trial transcripts that when juries come in that's when

---

[3] On the second day of trial, March 11, 2025, Mental Health Jail Liaison Specialist Lottie Gray informed the trial court that jail medical staff had attempted to perform certain medical checks not ordered by the court and that appellant had told the staff that such procedures were not part of the court order. After further discussion on the record, the court noted that appellant "was correct, so he was paying attention during a hearing and those specific things were not included in the Court order." (Tr. 173.) It remarked that appellant "knew that, was able to correct the jail medical staff, and then the jail medical staff realized he's right." (Tr. 173.) The trial court addressed appellant directly: "I think you are high functioning, you have an intellect, and, again, this is your choice." (Tr. 174.)

you tend to get verbal" and informed appellant that he would be removed in the event of such outbursts. (Tr. 70.)

{¶ 28} After the jury was selected and the trial court was releasing them for the day, appellant began making "very loud, screaming noises" in their presence. (Tr. 163-164.) The trial court remarked that it "was expecting this," because "[t]his is how you behaved last time as soon as, you know, the jury was in or started getting moving because your whole thing has been to obstruct and delay and it's been documented over many, many, many, many instances of interaction." (Tr. 164.) In other words, as in the previous case, appellant "didn't cause any disturbances until right before [the trial court] was dismissing the jury." (Tr. 164-165.)

{¶ 29} When trial reconvened on March 11, 2025, the trial court warned appellant that in the event of another outburst, he would be removed and would be required to participate via Zoom videoconferencing. The trial court then brought the jury into the courtroom, and appellant immediately "attempted to obstruct the process by screaming again." (Tr. 176.)

{¶ 30} Following appellant's removal from the courtroom, the trial proceeded without incident and the jury returned a verdict of guilty on the single count of vandalism. The trial court imposed a 12-month prison term and two years of postrelease control. This timely appeal followed.

## II. Assignment of Error

{¶ 31} Appellant presents a single assignment of error for our review:

The trial court erred when it conducted a jury trial for the appellant without first determining whether he was competent to stand trial.

{¶ 32} Finding no merit to the assignment of error, we affirm.

## III. Analysis

{¶ 33} "The test for determining whether a defendant is competent to stand trial is whether [the defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding — and whether he has a rational as well as factual understanding of the proceedings against him." (Cleaned up.) *State v. Pubill*, 2023-Ohio-3875, ¶ 18 (8th Dist.). "A defendant is rebuttably presumed to be competent to stand trial." *State v. Lawson*, 2021-Ohio-3566, ¶ 48, citing *State v. Barton*, 2006-Ohio-1324, ¶ 56.

{¶ 34} R.C. 2945.37(G) provides not only that a defendant is presumed to be competent, but also that it is the defendant's burden to demonstrate, by a preponderance of the evidence, that he is not. *Pubill* at ¶ 18, citing *State v. Daniel*, 2016-Ohio-5231, ¶ 19 (8th Dist.), citing *State v. Jordan*, 2004-Ohio-783, ¶ 28. Pursuant to the statute and governing case law, therefore, a defendant is presumed competent "unless it is demonstrated by a preponderance of the evidence that due to the defendant's present mental condition, he is incapable of understanding the nature and objective of the proceedings against him or of assisting in his defense." *State v. McAlpine*, 2024-Ohio-2455, ¶ 23 (8th Dist.).

{¶ 35} "We review a trial court's determination of competency under the abuse of discretion standard." *Id.* at ¶ 22. In light of that standard, "[a] trial court's finding that a defendant is competent to stand trial will not be disturbed when there is some reliable and credible evidence supporting that finding." *Id. See also Daniel*

at ¶ 20. Moreover, "[d]eference on these issues should be given 'to those who see and hear what goes on in the courtroom.'" *Id.* at ¶ 20, quoting *State v. Cowans*, 87 Ohio St.3d 68, 84 (1999). *See also Pubill* at ¶ 15.

{¶ 36} Where the issue of competency is raised before trial, "'there is no question that . . . a competency hearing is mandatory.'" *State v. Harris*, 2015-Ohio-5409, ¶ 12 (8th Dist.), quoting *State v. Bock*, 28 Ohio St.3d 108, 110 (1986). Even a "brief colloquy," however, may be sufficient to satisfy the hearing requirement. *State v. Lozada*, 2020-Ohio-5008, ¶ 12 (8th Dist.).

{¶ 37} The record in the present case, including but not limited to the transcript, reflects a far more fulsome inquiry than in *Lozada* and contains ample reliable, credible evidence of appellant's competency. In addition to recounting appellant's history of being found competent, the trial court at various points referenced appellant's handwritten letters as indicative of his competency, as well as his counseling of fellow patients to feign hearing voices and his accurate correction of jail personnel with respect to the scope of a court order. In the second hearing conducted on January 8, 2025, the trial court noted that appellant's behavior was "willful," "voluntary," and "obstructionist," and gave appellant an opportunity to respond. The trial court, observing appellant's demeanor and behavior, noted for the record that appellant "raised [his] middle finger even higher in response to that." (Tr. 38.) This exchange further supports the trial court's finding that appellant understood precisely what was happening in the courtroom and voluntarily chose to be obstructive rather than assisting his attorney with his own defense.

{¶ 38} The trial court revisited the competency issue at the time of trial, noting appellant's documented habit of silent, raised-middle-finger defiance in proceedings outside the jury's view followed by performative outbursts in the jury's presence. The trial court's use of the previous trial transcript as a "roadmap" served it well, given that appellant used the same playbook as in that trial. In that regard, this court held in the previous action that his "outrageous courtroom behavior does not undermine the trial court's finding of his competence to stand trial." *Pubill*, 2023-Ohio-3875, at ¶ 22 (8th Dist.). This is because "'[i]ncompetency must not be equated with mere mental or emotional instability or even outright insanity. A defendant may be emotionally disturbed or even psychotic and still be capable of understanding the charges against him and of assisting his counsel.'" *Id*. at ¶ 22, quoting *Bock* at 110. A trial court "'may not find a defendant incompetent to stand trial or plead guilty solely because he suffers from a mental illness or intellectual disability.'" *Pubill* at ¶ 22, quoting *State v. McMillan*, 2017-Ohio-8872, ¶ 29 (8th Dist.).

{¶ 39} Moreover, the law is clear that "[a]n evaluation is not statutorily required," and that "the right to an evaluation does not rise to the level of being a constitutional guarantee unless the record contains "'sufficient indicia of incompetence,'" such that the inquiry is necessary to ensure the defendant's right to a fair trial.'" *Lozada*, 2020-Ohio-5008, at ¶ 11 (8th Dist.), quoting *State v. Johnson*, 2006-Ohio-6404, ¶ 160, quoting *State v. Skatzes*, 2004-Ohio-6391, ¶ 156, and *State v. Berry*, 72 Ohio St.3d 354, 359 (1995). Like the trial court, we are in the unique

position of addressing competency issues pertaining to an individual repeatedly found to be willfully obstructionist, intractably stubborn, but both fully able to understand the nature of the trial court proceedings and, if only he were willing, to assist his attorney in defending him. This court's earlier decision on appellant's competency rejected the claim that the trial court was required to order yet another competency evaluation:

> "It is within the trial court's discretion to order a second evaluation." [*State v.*] *McConnell*, 5th Dist. Perry No. 20-CA-00005, 2021-Ohio-41, ¶ 24. R.C. 2945.371(A) states in pertinent part, "If the issue of a defendant's competence to stand trial is raised . . . , the court may order one or more evaluations of the defendant's present mental condition." *"[T]he use of the word 'may' supports the conclusion that a trial court is not required to order an evaluation of the defendant's mental condition every time he raises the issue. Instead, the wording of the statute implies that the ordering of an examination is a matter within the discretion of the trial court." McConnell* at ¶ 24, citing *State v. Bailey*, 90 Ohio App.3d 58, 67, 627 N.E.2d 1078 (11th Dist.1992); *State v. Eick*, 5th Dist. Stark No. 2010CA00267, 2011-Ohio-1498, ¶ 32.

(Emphasis added.) *Pubill* at ¶ 20.

{¶ 40} In light of the statutory framework, the relevant case law, appellant's history, and the record, we reject appellant's argument that the trial court here was required to order a new competency evaluation. As noted above, appellant has not updated his playbook: his behavior in the present action was neither new nor different when compared to his previous obstructionist tactics, which align with his apparent identification as a "sovereign citizen." *Pubill* at ¶ 23-24. Self-identified "sovereigns," while deeply misinformed, are not necessarily incompetent to stand trial; this court found in appellant's previous appeal that his "behavior is indicative of his belief that he is a sovereign citizen and not of incompetency." *Pubill* at ¶ 24.

In a similar vein, the Seventh Circuit once wrote that "[s]ome people believe with great fervor preposterous things that just happen to coincide with their self-interest." *Coleman v. Commr.*, 791 F.2d 68, 69 (7th Cir. 1986) (Easterbrook, C.J.). "[M]erely believing in fringe views does not mean someone cannot cooperate with his lawyer or understand the judicial proceedings around him." *United States v. Gooch*, 595 Fed.Appx. 524, 527 (6th Cir. 2014).

{¶ 41} Moreover, as discussed in this court's decision in his previous appeal, appellant has a history of steadfastly refusing to participate in evaluations both in jail and when transported for evaluation. "The trial court previously ordered two competency evaluations, and Pubill refused to participate in both. *We see no evidence that Pubill would have participated in a third, given his prior refusal.*" (Emphasis added.) *Pubill*, 2023-Ohio-3875, at ¶ 25 (8th Dist.). We therefore agree with the State that the trial court "reasonably concluded that a new assessment was unnecessary" not only because of multiple previous findings of competency but because of appellant's "documented history of noncompliance during such evaluations." (State's brief at p. 10.)[4]

{¶ 42} Finally, appellant argues that the trial court erred in not ordering further evaluation because of a purported conflict between a 2020 NOPH evaluation and the 2022 NBH evaluation:

> In the evaluations reviewed by the trial court, there were inconsistent
> findings between the reports from Northcoast Behavioral Healthcenter

---

[4] We further note that while the trial court expressed extreme skepticism that yet another competency evaluation would have a different outcome, it did not decisively rule out that option. Appellant did not formally request a competency evaluation.

and the Northwest Ohio Psychiatric Hospital. NBH determined that Appellant was being obstructive and uncooperative on purpose, while NOPH [diagnosed] the Appellant with an unspecified mood disorder and a possible Cluster A personality disorder. The trial court did not address this conflict[.]

. . .

Prior evaluations reached different conclusions in [diagnosing] the Appellant and such conflicting reports were not addressed or reconciled by the trial court prior to starting the jury trial.

(Appellant's brief at p. 2 and p. 6.)

{¶ 43} The conflict is illusory. It stems from the inaccurate suggestion that the trial court was referencing, quoting, and considering *separate* 2020 and 2022 reports. The record contains only the June 2022 NBH report, which included a review of appellant's prior medical records. A comparison between the transcript and the report reveal that the trial court's reference to appellant's NOPH evaluation in 2020 is nothing more than a quotation from the 2022 NBH report, which included the evaluator's summary of her review of NOPH medical records from 2020. The 2020 NOPH diagnosis of "Unspecified Mood Disorder" and "concern that he may have a Cluster A personality disorder" were therefore expressly raised and considered in the NBH's nine-page, single-spaced 2022 report. NBH acknowledged NOPH's earlier concerns but ultimately concluded that appellant understood the nature and objective of the legal proceedings against him and was capable of assisting in his defense.

{¶ 44} NBH did not note any competency concerns in connection with its review of the 2020 NOPH records. Even if there were a conflict relevant to

competency, appellant fails to explain why any further referral is required when any issues arising from the medical records were considered and resolved in 2022. This is especially true where, as the State notes, appellant's trial counsel made no arguments that appellant's recent behavior was new or different in comparison to his obstructionist tactics in 2022.

{¶ 45} The record supports the trial court's conclusion that appellant's behavior in the past was volitional and targeted to disrupt proceedings, that his behavior in the present action was more of the same, and that none of this demonstrated incompetency. Appellant's sole assignment of error is overruled.

{¶ 46} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
DEENA R. CALABRESE, JUDGE

EMANUELLA D. GROVES, P.J., and
SEAN C. GALLAGHER, J., CONCUR